In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 00-3979, 01-1148

LOEB INDUSTRIES, INCORPORATED, LOS ANGELES SCRAP
IRON & METAL CORPORATION, and METAL PREP COMPANY,
INCORPORATED,

*Plaintiffs-Appellants*,

*v.*


SUMITOMO CORPORATION and GLOBAL MINERALS
AND METALS CORPORATION,

*Defendants-Appellees*.

_____

LOEB INDUSTRIES, INCORPORATED, LOS ANGELES SCRAP
IRON & METAL CORPORATION, and METAL PREP COMPANY,
INCORPORATED,

*Plaintiffs-Appellants*,

*v.*


JPMORGAN CHASE & CO.,*

*Defendants-Appellees*.

_____

ARGUED SEPTEMBER 5, 2001

_____

_____

* For purposes of this opinion we are using the current name of
the bank, which is JPMorgan Chase & Co. That entity includes
both J.P. Morgan & Co., Inc., and Morgan Guaranty Trust Co. of
New York.

Nos. 01-3229, 01-3230

OCEAN VIEW CAPITAL, INCORPORATED, formerly
known as TRIANGLE WIRE & CABLE, INCORPORATED,

*Plaintiff-Appellant*,

*v.*

SUMITOMO CORPORATION OF AMERICA,
SUMITOMO CORPORATION, GLOBAL MINERALS
AND METALS CORPORATION, *et al.*,

*Defendants-Appellees.*

————————

SUBMITTED SEPTEMBER 13, 2001[**]

————————

No. 01-3485

VIACOM, INCORPORATED, as successor by
merger to CBS CORPORATION, formerly known
as WESTINGHOUSE ELECTRIC CORPORATION,
and EMERSON ELECTRIC COMPANY,

*Plaintiffs-Appellants*,

*v.*

GLOBAL MINERALS AND METALS CORPORATION
and CREDIT LYONNAIS ROUSE, LTD.,

*Defendants-Appellees.*

————————

ARGUED MAY 16, 2002

————————

[**]   After an examination of the briefs and the record in Nos. 01-3229 and 01-3230, we have concluded that oral argument is unnecessary. Thus, those appeals are submitted on the briefs and the record. See FED. R. APP. P. 34(a)(2).

Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 99 C 377, 99 C 468, 99 C 621, 99 C 801, 00 C 274,
00 C 528—**Barbara B. Crabb**, *Chief Judge.*

———————

DECIDED SEPTEMBER 20, 2002

———————

Before CUDAHY, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* These cases, which we have consolidated for purposes of this opinion, all arise out of an alleged conspiracy in the 1990s to fix the price of copper futures at artificially high levels on the international exchange markets. This market manipulation necessarily and directly inflated the price of the products purchased by the plaintiffs, buyers of copper cathode, copper rod, and scrap copper, who have sued for violations of the Sherman Act, RICO, and various state laws. The district court dismissed the claims of each of the plaintiffs either on the ground that their claims were barred by the indirect purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), or on the ground that their injuries were too remote and speculative under *Associated General Contractors of Cal. Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) (*AGC*). We find that *Illinois Brick* presents no obstacle to any of the plaintiffs' claims but that the claims of the scrap copper dealers are precluded under *AGC*. On the other hand, we conclude that the purchasers of copper cathode and rod have suffered a direct and independent injury and are the best situated participants in the physical copper market to bring a lawsuit. We therefore affirm in part, reverse in part, and remand in part for further proceedings.

**I**

## A. The Parties

The production of copper entails a complicated four-step process. First, copper producers extract ore from a copper mine and crush or mill it into a gravel-like substance known as concentrate. Second, smelters separate out the nonferrous metals in the concentrate, producing one-meter square plates of anode, which are approximately 90% copper. Next, the anode is refined electrolytically to create sheets of cathode. Finally, the cathode is fed into a furnace at a mill and melted into rod or wire. In the course of manufacturing cathode and rod, scrap copper is also produced, and it too can be sold into the market.

The plaintiffs in these actions are large companies occupying various positions along the copper production chain. The plaintiffs in No. 01-3485, Viacom, Incorporated (a successor to Westinghouse Electric Corporation) and Emerson Electric Company, turn copper cathode into wire for resale to merchants. Each purchased hundreds of millions of pounds of cathode during the relevant time period from integrated producers, who smelt and refine copper from their own mines into cathode.

Ocean View Capital is the plaintiff in Nos. 01-3229 and 01-3230. Until it went out of business in 1996, it was a large Rhode Island-based manufacturer of copper wire and cable. Unlike Viacom and Emerson, Ocean View normally did not purchase cathode; instead, it bought copper that had already been transformed into rod. Some of this rod was manufactured by integrated producers. Ocean View also contracted frequently with semi-fabricators, which own and operate rod mills but do not own mines, concentrators, smelters, or refineries. Instead, semi-fabricators typically purchase cathode from producers or copper traders and fabricate the cathode into rod. On some occasions, Ocean View varied this process by entering into tolling

agreements with its semi-fabricators under which it purchased its own cathode from producers or traders and then paid the semi-fabricator to convert it into usable rod.

The plaintiffs in *Loeb Industries v. Sumitomo*, Nos. 00-3979 and 01-1148, are three scrap metal dealers (to whom we refer as the "Scrap Dealers"). Each purchases only scrap copper; none buys either cathode or rod. The scrap is purchased from a variety of sources, including integrated producers and wire manufacturers, and then repackaged and resold.

### B.  The Copper Market

Despite the fact that copper is sold in a variety of physical forms, the summary judgment record (viewed in the light most favorable to the plaintiffs) indicates that the pricing of copper is consistent throughout the industry. Like many other commodities, copper is traded on commodities exchanges through warrants and futures contracts. Most copper futures are traded on either the London Metals Exchange (LME) or the Commodities Exchange Division of the New York Mercantile Exchange (known familiarly as the "Comex"). When futures contracts mature, they must either be closed out by an offsetting trade or satisfied by deliveries of the underlying physical goods. If a futures trader is short, she must satisfy her obligation under the futures contract by immediately delivering physical copper cathode to an LME or Comex warehouse; if a trader is long, she may similarly call in physical copper cathode from a warehouse. Because of this, the price of physical copper, including cathode, rod, and scrap copper, is directly linked to the LME and Comex price for copper futures, and dealers in all forms of physical copper quote prices based on rigid formulas related to copper cathode futures.

While sales between six plaintiffs and numerous other copper industry participants are involved, we will illustrate this linkage by discussing only the relationship between one of the plaintiffs, Viacom, and the largest integrated producer, Asarco. Viacom entered into yearly supply contracts with Asarco, copies of which are included in the record. In these contracts, the price Viacom paid Asarco for cathode was made up of two components. First, the base price was set by "the arithmetic average of the COMEX first position settlements for high-grade copper during the calendar month of scheduled shipment." From 1990 to 1996, this price fluctuated from about 75¢/lb to over $1.40/lb. Added to the base price was a "cathode premium" that was set on a monthly or quarterly basis. Asarco's premium fluctuated over the relevant time period from 2.75¢/lb to 3.5¢/lb. The record also indicates that when the base price of copper increased, the premium tended to increase as well.

Viacom bought over half a billion pounds of cathode from Asarco. Asarco manufactured most of this cathode, but some had been purchased for resale from other merchants to make up for production shortfalls. Because records of these purchases were not kept, it is impossible to tell whether any particular pound of cathode sold to Viacom was manufactured by Asarco or merely purchased for resale. The defendants concede, however, that some of the cathode in question was being sold into the market for the first time. While there is some dispute as to the exact numbers, taking the evidence in the light most favorable to Viacom, Asarco sold it 510 million pounds of cathode over the relevant period. During this same time frame, Asarco refined 6.4 billion pounds of cathode and purchased 153 million pounds from third parties. Therefore, even if one assumed that every scrap of Asarco's previously sold cathode was shipped to Viacom (instead of to one of its many other customers), Viacom still purchased 357 million

pounds of never-before-purchased cathode. Viacom seeks damages in this suit only for cathode that was sold to it for the first time by its integrated producers.

Asarco also purchased raw materials, such as concentrate and anode, to supplement its own production and keep its smelters and refineries running at full capacity. At least 27 million pounds of the cathode Asarco shipped to Viacom consisted entirely of Asarco raw materials, but the rest may well contain some percentage of previously purchased materials. While raw materials are often priced in reference to Comex prices, only cathode is actually traded on the exchange. Raw material prices also incorporate significant and widely varying discounts based on both the cost of converting the materials into cathode and current refining and smelting capacity. Furthermore, the defendants' experts testified that while the prices of raw materials "may be indirectly affected by the manipulations," a squeeze or corner on cathode could not directly harm the purchasers of pre-cathode raw materials.

The pricing of rod and scrap are similar except that each contains further premiums and discounts off the cathode futures price to reflect a variety of additional costs. Rod pricing contains an additional rod or shaping premium. Scrap copper prices are affected by not only the price of cathode but also freight costs, sizing, sorting, packaging, and purity requirements.

Some of Viacom's suppliers and customers engaged in strategic hedging by purchasing "put" options on the futures markets. A put option holder has the right, but not the obligation, to sell a futures contract at an established "strike" price. If the market price is higher than the strike price (because, for example, the price has been artificially raised), the holder's option will expire and its only cost will be the price of the option. Asarco purchased put options to hedge its output, but it did not hedge

against specific transactions, by, for example, purchasing a futures contract for each sale made to Viacom. Its hedging activities were also limited to a fraction of its supply. One of Viacom's suppliers, Kennecott, did not hedge at all, and Viacom itself never hedged its copper purchases.

## C. The Conspiracy

Defendant Sumitomo Corporation is a Japanese trading corporation that attempted to fix and maintain the price of copper at artificially high levels from September 1993 to June 1996, all with an eye to enriching itself in its capacity as a seller of physical copper. Through a series of transactions with defendant Global Minerals and Metals Corporation, a copper merchant, it hoarded vast supplies of physical copper for the purpose of restricting supply, and it entered into paper transactions in order to show a false increased demand for the metal. In particular, Sumitomo established sham long-term contracts that purportedly required it to purchase vast quantities of copper from Global on a monthly basis over a period of three years. These sham contracts enabled Sumitomo publicly to justify its accumulation of excessive copper forward positions as a hedge. By June 1995, Sumitomo held approximately ten percent of the entire long position in Comex copper futures.

At that time, Sumitomo began to call in shorts to raise copper demand to inflated levels and to reap the profits from its sales. When these contracts came due, short futures traders were forced to cover their positions by acquiring physical copper at inflated prices, because no new copper was entering the warehouses thanks to Sumitomo's actions. These manipulations caused the price of primary copper to rise more than 50% over a two-year period. In June 1996, the scheme was uncovered, and the trading price for copper dropped by a third almost over-

night. The prices of physical copper cathode, rod, and scrap crashed comparably.

In 1998, the United States Commodities and Futures Trading Commission (CFTC) determined that Sumitomo had violated the Commodity Exchange Act by raising and fixing the price of copper futures and reached a settlement with the company that required it to pay a $150 million fine. That finding has spawned a number of antitrust suits against the defendants, including class action lawsuits on behalf of those who traded copper futures and on behalf of certain purchasers of primary copper. Sumitomo settled its suit with the futures traders for approximately $134 million. The defendants have also settled a California state court class action brought under various state antitrust laws. Many of the plaintiffs' sellers, including Asarco, participated in the lawsuit and received 0.15 cents per dollar of copper purchased.

## II.  Proceedings in the District Court

These lawsuits were all consolidated in the Western District of Wisconsin by the Judicial Panel on Multidistrict Litigation. The defendants include not only Sumitomo and Global, but also alleged co-conspirators Credit Lyonnais Rouse, Ltd. (CLR), and J.P. Morgan and Morgan Guaranty Trust (which have since merged to form JPMorgan Chase & Co. and to whom we refer collectively as JPMorgan Chase). The plaintiffs in each case sought damages for the allegedly inflated overcharge in the price of the copper products they had purchased, which was caused by Sumitomo's actions. The Scrap Dealers also sought certification of a class under FED. R. CIV. P. 23 consisting of all metals dealers who purchased any form of physical copper in commercial quantities between 1994 and 1996. The defendants moved to dismiss each of the actions.

The district court first denied the motion to dismiss Ocean View's complaint on May 9, 2000. *In re Copper Antitrust Litig.*, 98 F. Supp. 2d 1039 (W.D. Wis. 2000). The district court found that if the facts alleged in the complaint were true, Ocean View was a proper party to sue under the principles espoused by this court in *Sanner v. Board of Trade*, 62 F.3d 918 (7th Cir. 1995). The court also denied a motion to dismiss Viacom's complaint on similar grounds. It allowed both cases to proceed, but limited discovery to the issue of standing.

The court next examined the claim of the Scrap Dealers. It denied their motion for class certification, fundamentally because it concluded that the proposed named plaintiffs could not sue, either for their own injuries or for those of others similarly situated, because they fell within the ban on indirect purchaser suits established by *Illinois Brick*, 431 U.S. at 720. The court decided in addition that the proposed class would be unmanageable, because it would be impossible to ascertain class membership. It then turned to the defendants' 12(b)(6) motion to dismiss. The court found that the Scrap Dealers' bare-bones allegations were sufficient to state a claim, but that in light of deposition testimony and other facts adduced during litigation of the *class certification* question, it would nonetheless grant the motion based once again on the perceived *Illinois Brick* flaw. The court did not, in so ruling, follow the command of Rule 12(b)(6) to convert the motion to dismiss into a motion for summary judgment under Rule 56, despite its reliance on matters outside the complaint. The court also dismissed the Scrap Dealers' RICO allegations on the same grounds.

Soon thereafter the district court granted JPMorgan Chase's motion to dismiss all claims that the Scrap Dealers had brought against it on the ground that the plaintiffs were subject to offensive issue preclusion on the pivotal question of their status as indirect purchasers.

After discovery closed in the remaining cases, the defendants filed for summary judgment. On July 23, 2001, the district court granted summary judgment to all of the defendants on Ocean View's claims, finding that Ocean View had no right to sue under the antitrust laws both because it was an indirect purchaser (*Illinois Brick*) and because its injuries were too remote (*AGC*).

A month later, the district court granted summary judgment to Global and CLR on Viacom's claim. In contrast to its conclusions in *Loeb* and *Ocean View*, the court here rejected the argument that the claim was barred by *Illinois Brick*. Instead, it applied the factors set forth in *AGC* and determined that a manipulation of the futures market would have effects too "subtle and complex" to warrant recovery for these cathode purchasers. The district court primarily relied on the following factors: (1) the huge number of exchange-based pricing formulas available on Comex; (2) the various premiums and discounts available in the industry; (3) potential duplication of recovery due to purchases of cathode and raw materials by the integrated producers who sold to Viacom; (4) potential duplication of recovery due to hedging; and (5) the complexity of the damages calculation. For similar reasons, the district court also granted summary judgment to the defendants on Viacom's RICO claims. With the federal claims gone, it finally dismissed Viacom's state law claims without prejudice.

### III.  Use of Rule 12(b)(6)

Before turning to the important antitrust issues underlying all of these appeals, we must deal with an issue of federal civil procedure unique to the appeal of the Scrap Dealers. They argue that the district court committed reversible error by relying on outside materials in evaluating the motion to dismiss without giving them notice

and an opportunity to submit additional materials. As they correctly point out, Rule 12(b) requires that if the district court wishes to consider material outside the pleadings in ruling on a motion to dismiss, it must treat the motion as one for summary judgment and provide each party notice and an opportunity to submit affidavits or other additional forms of proof. *Fleischfresser v. Directors of School Dist. 200*, 15 F.3d 680, 684 (7th Cir. 1994). This requirement of a reasonable opportunity to respond is mandatory, not discretionary. *Edward Gray Corp. v. National Union Fire Ins. Co.*, 94 F.3d 363, 366 (7th Cir. 1996).

In this case, the district court stated that, considering only the bare pleadings, it would find that the Scrap Dealers had stated a claim. Notwithstanding this conclusion, relying on the materials and affidavits produced for the earlier class certification hearing, it instead granted the defendants' motion dismissing the case. We agree with the Scrap Dealers that this was error, and that the district court should have given them notice of its intentions and an opportunity to respond and produce additional facts going beyond whatever might have been appropriate for class certification purposes.

The question, however, is what the consequence of this error should be. The Scrap Dealers assume that reversal should be automatic, but this position overlooks the command of 28 U.S.C. § 2111, which directs appellate courts to apply the harmless error rule to anything that does not affect the "substantial rights of the parties." We are not aware of any case that holds that the command of Rule 12(b)(6) to convert a motion to dismiss into a summary judgment motion is somehow exempt from § 2111. The question for us is therefore whether the district court's error affected the Scrap Dealers' substantial rights.

To answer that question, we must consider whether the Scrap Dealers have shown us any evidence raising a

question of material fact that they would have submitted to the district court had they been given proper notice of the *de facto* conversion. *Burick v. Edward Rose & Sons*, 18 F.3d 514, 516 (7th Cir. 1994). If there are no potential disputed material issues of fact, then the court's reliance on materials outside the pleadings is not by itself ground for reversal despite the failure to follow appropriate procedures. *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 510 (7th Cir. 1999). Here, the dispute over whether the Scrap Dealers were proper plaintiffs to sue under the antitrust laws was a hard-fought issue in the class certification hearings, and the Scrap Dealers devoted substantial portions of both their reply brief and supplemental brief to the issue. Furthermore, the district court provided an after-the-fact opportunity to the Scrap Dealers to bring additional materials to its attention in the subsequent litigation against JPMorgan Chase. See *Edward Gray Corp.*, 94 F.3d at 366 (reversing where plaintiff had no opportunity to submit materials that did create a factual dispute). In light of these facts, we are confident that the Scrap Dealers had a full opportunity to bring all material factual disputes to the court's attention. Therefore, we will review dismissal of all of these actions, as we would any other ruling on summary judgment, drawing all disputed or potentially disputed factual inferences in favor of the plaintiffs and deciding *de novo* whether the defendants were entitled to judgment on the law. *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 491 (7th Cir. 2002).

The Scrap Dealers also contend as a threshold matter that the district court's reliance on materials submitted for the class certification hearing to rule against them on summary judgment violates the dictates of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974). This over-reads *Eisen,* in our opinion. *Eisen* merely indicates that a court may not refuse to certify a class on the ground that it

thinks the class will eventually lose on the merits. *Id.* at 177-78; see also *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 677 (7th Cir. 2001). It says nothing about whether courts may use evidence produced at a prior class certification hearing for other purposes, including for a decision on summary judgment. We see no reason why these affidavits should be treated any differently from other parts of the record which may be considered in later rulings. See *Kochlacs v. Local Bd. No. 92*, 476 F.2d 557, 558 n.1 (7th Cir. 1973). We may therefore rely on the materials and affidavits submitted at the class certification hearing in determining whether the district court's decision to grant the defendants' motion in the Scrap Dealers' action was correct.

## IV. *Illinois Brick*

While the Clayton Act permits civil suits by "any person who shall be injured in his business or property," 15 U.S.C. § 4, courts have long acknowledged that not every person, however tangentially injured by an antitrust violator, may recover treble damages. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982). Numerous doctrines have arisen to clarify the circumstances under which a particular person may recover from an antitrust violator. At times these doctrines are rather incautiously lumped together under the umbrella term of "antitrust standing." However, the Supreme Court has generally been careful to limit the actual question of standing to the simple inquiry of whether a plaintiff has suffered a redressable injury in fact, entitling the federal courts to hear such a "case or controversy" under Article III. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). There is no dispute that the plaintiffs in these cases have been injured by paying an inflated price for copper; their Article III standing is therefore secure. The difficult

question is statutory, because the Sherman Act has additional rules for determining "whether the plaintiff is the proper party to bring a private antitrust action." *AGC*, 459 U.S. at 535 n.31. For example, the injury must be an "antitrust injury" caused by anti-competitive behavior as opposed to mere economic loss. *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-89 (1977). Two other limitations on which parties may bring suit for antitrust violations are central here: the proximate cause requirements of *AGC*, 459 U.S. at 544-45, and the direct purchaser rule of *Illinois Brick*, 431 U.S. at 729-30.

*Illinois Brick* holds that the direct purchaser from the alleged antitrust violator(s) is the one with the right of action; those further removed from the illegal arrangement may not (under the federal antitrust laws, at least) bring their own actions. 431 U.S. at 729. In *Illinois Brick* itself, the defendants were companies who sold bricks to masonry contractors at allegedly inflated prices. The contractors in turn allegedly "passed on" those overcharges to the plaintiffs who purchased their constructed buildings. *Id.* at 726. In an earlier decision, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968), the Supreme Court had decided that defendants could not escape liability on the ground that the plaintiff had passed on the anticompetitive overcharge. By parity of reasoning, the Court decided in *Illinois Brick* that the persons authorized to sue under the antitrust laws in this type of case were the direct purchasers. Hence, the contractors were permitted to sue and recover in full for the price inflation, including any "pass-on."

*Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase). Such a rule would eliminate in one fell swoop all competitor suits based on exclusionary practices—a step

that some antitrust theorists have urged, but a step that the Supreme Court has never taken. To the contrary, the Court has made it clear that it does not read *Illinois Brick* so broadly. For instance, the plaintiff in *McCready*, who purchased the defendant's health services from her employer, alleged that a conspiracy between the defendant and psychiatrists increased her costs for visiting a psychologist. 457 U.S. at 468-70. The defendant contended that after *Illinois Brick* only the employer who purchased the health plan should be permitted to sue, but the Court disagreed. It held that the chain-of-distribution inquiry in *Illinois Brick* was meant only to preclude duplicate recovery. While the employer might have suffered some economic injury (through, for example, paying higher wages to attract skilled workers in order to compensate for the illegally inferior benefits), its harm was distinct from the plaintiff's injury, her own out-of-pocket payments for psychological services. *Id.* at 475.

While it is not identical to this case, *McCready* is helpful insofar as it recognizes that different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus that differently situated plaintiffs might be able to raise claims. The injuries suffered by the copper traders who purchased inflated futures contracts from the defendants are distinct from any harm inflicted on Viacom when it paid inflated cash prices for cathode, or on Ocean View, to the extent it purchased copper rod from integrated producers. Other cases also demonstrate that the Supreme Court has been willing to entertain suits between plaintiffs and defendants not in privity with each other. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) (plastic conduit manufacturer suing competitor steel conduit manufacturer); *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85 (1984) (university suing association that prohibited it from entering a television contract); *Klor's Inc. v.*

*Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959) (store suing competitor over refusal to deal).

The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did *not* sell to them. Rather, it was because the defendants *did* sell to a third party who (after *Hanover Shoe*) could recover for any injury they claimed. The same paradigm applies in all of the cases cited by the defendants: Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit over-charges that B passed on to C. See, *e.g.*, *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990) (public utilities but not residential customers to whom they sell may sue natural gas companies); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997) (drug wholesalers but not retail pharmacies to whom they sell may recover from manufacturers); *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 852-54 (3d Cir. 1996) (attorneys may recover overcharges for copies, but the clients to whom they offer services may not); *In re Beef Indus. Antitrust Litig.*, 710 F.2d 216, 218 (5th Cir. 1983) (packers who sell to grocers may recover for their unlaw-ful conduct but feeders who sell to packers may not).

Here, in contrast, the plaintiffs are not indirect pur-chasers along a supply chain. As far as the plaintiffs' claims are concerned, Global, CLR, and Sumitomo did not sell cathode to integrated producers who in turn sold to any of the plaintiffs. Instead, the alleged conspiracy operated in the separate but related futures market, through which it sought directly to manipulate the price of copper the plaintiffs were buying. (It is true that Sumitomo Corporation made some sales of cathode, pri-marily overseas, to reap the benefit of its illegal futures market scheme. None of the plaintiffs, however, is seek-ing recovery on the basis of any of these cash market sales; all rest solely on the manipulation of sales of futures

contracts. *Sanner v. Board of Trade*, 62 F.3d 918, 929 (7th Cir. 1995), discussed below, recognizes such a theory, and we see no reason why the mere existence of separate independent physical transactions should in any way change the analysis.)

The defendants repeatedly urge that the availability of recovery for copper futures traders who bought and sold from the defendants in that market should bar recovery for any plaintiff in the cash market. But this kind of an absolutist approach is ruled out by *Sanner*, which recognized at least one situation in which the futures market and physical market must be evaluated separately. The serious question here is whether these plaintiffs have presented another such instance.

In *Sanner*, a group of soybean farmers sued the Chicago Board of Trade alleging that the Board conspired with several individuals artificially to lower the price of soybean futures. The farmers suffered damages when they were forced to sell their soybeans into the cash market at correspondingly low prices. *Id.* at 921. The district court granted a motion to dismiss, finding as a matter of law that the farmers' injuries were indirect because the farmers did not participate in the futures market, that the causal chain between the cash and futures prices was too attenuated, and that damages were too speculative. *Id.* at 926.

This court reversed the dismissal. On the assumption (given the procedural posture of the case) that the farmers' allegations about the relation between the cash and futures markets were true, and that those market prices "tend[ed] to move in lockstep," we determined that the farmers had suffered sufficiently direct injuries from the conspiracy to proceed with their case. *Id.* at 929-30. We rejected the proposition that "participants in the futures market were more directly injured," so as to preclude

recovery by farmers in the cash market and denied the defendants' claim that we should assume at the motion to dismiss stage that damages would be too speculative. *Id.* at 931. From the perspective of *Illinois Brick*, the *Sanner* court expressly found that in the context of a market manipulation scheme, damages inflicted on the physical commodity market were not derivative of injuries in the futures market. Unlike *Illinois Brick*, the harms incurred in the physical market during a market manipulation are not "secondary consequences arising from an injury to a third party." *Id.* at 929. Instead, they form a separate and compensable injury.

The defendants' reading of *Illinois Brick* is inconsistent with *Sanner*. Their claims to the contrary, there is no indication in *Sanner* that the plaintiff soybean farmers were in privity with the Board of Trade, and as a factual matter the assertion is surely wrong. The Board and its members did not sell soybeans to the farmers; like the defendants here they dealt solely with futures contracts. If *Illinois Brick* bars all recovery here, it should have barred recovery in *Sanner* and should also bar recovery in group boycott and other restraint of trade settings.

To put it another way, *Hanover Shoe*, *Illinois Brick*, and *McCready* make plain that the antitrust laws create a system that, to the extent possible, permits recovery in rough proportion to the actual harm a defendant's unlawful conduct causes in the market without complex damage apportionment. This scheme at times favors plaintiffs (*Hanover Shoe*) and at times defendants (*Illinois Brick*), but it never operates entirely to preclude market recovery for an injury. Applying those principles and the decision in *Sanner* to this case, we conclude that the evidence viewed favorably to the plaintiffs shows that damage from the defendants' conduct was felt in two separate markets: the futures market and the

physical copper market.*** We have identified those who may recover in the futures market and must now turn to the more difficult question of establishing the proper plaintiff in the physical market. The defendants' answer (nobody) is not supported by *Illinois Brick*—or economics or fairness for that matter. Instead, we must be guided in our inquiry by the analytical framework and factors set out in *AGC*.

## V. *Associated General Contractors*

*AGC* requires a court to examine through a case-by-case analysis the link between a plaintiff's harm and a defen-

---

*** The fact that the defendants were hoping to profit in the physical market, ultimately, through their manipulation of the separate futures market, also has implications for their arguments related to the so-called "umbrella standing" theory. The defendants object to the possibility that they might be held responsible for higher copper prices throughout the physical market, rather than just for the sales they made. If this were an ordinary cartel case, in which cartel members A and B sell to customers X and Y, and then non-cartel member firm C makes sales at or near the enhanced cartel price to customer Z, the question arises whether A and B are liable to Z for the overcharges it paid. See generally, ABA Section of Antitrust Law, 1 Antitrust Developments (Fourth) at 778-79 & n.128 (1997) (collecting cases on umbrella standing). Here, however, we have a conspiracy to rig prices for the entire physical market, accomplished through manipulation of the Comex futures market. Another possible analogy might be to rigging product standards, which affects everyone who tries to participate in a particular product market. In the latter case, the defendants who manipulated the standards cannot be heard to complain that they should be immune from damages for a product they did not sell. We leave this issue open for further exploration at the district court level, now that we have clarified how the direct purchaser rule and the remoteness doctrine of *AGC* apply here.

dant's wrongdoing. 459 U.S. at 535-36. We are to consider a number of factors in this analysis, notably (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment. *Id.* at 537-45; *Sanner*, 62 F.3d at 927. The defendants concede only the second factor: they admit that each of the plaintiffs has adduced evidence sufficient to survive summary judgment that they intended artificially to inflate the price of both copper futures and physical copper in order to reap millions of dollars in profits. They contest each of the other points.

The first and third factors are discussed only cursorily by the defendants and can be dealt with adequately in the course of our analysis of the remaining three. For example, the defendants claim that there is no causal connection between their actions and any of the plaintiffs' harms because the plaintiffs' injuries are indirect (the fourth factor), and they argue that Congress had no intention of redressing this sort of injury because it is indirect and speculative (the fifth factor). We therefore devote our attention to the other three factors, considering in the case of each plaintiff whether its injury was indirect and unpredictable, risked duplicate recovery, and would lead to speculative and complex damage apportionment. We begin with the claims of the Scrap Dealers.

### A.  Scrap Dealers (*Loeb,* Nos. 00-3979, 01-1148)

The Scrap Dealers face problems with all three of the contested *AGC* factors. First, whether or not they were in some sense original purchasers of physical copper, that fact alone is not enough to establish that their injury

flowed directly from the defendants' market manipulations. An injury is still indirect if a plaintiff fails to establish a chain of causation between the harm it has suffered and the defendant's wrongful acts. *AGC*, 459 U.S. at 541. The directness inquiry further focuses on the presence of more immediate victims of an antitrust violation in a better position to maintain a treble damages action. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Id.* at 542.

There are numerous other parties who have suffered more direct injuries at the hands of the defendants than the Scrap Dealers suing here. Among them (though as we explain below not limited to them) are the Comex copper futures traders who have already filed and settled their claims with the defendants. But even in the physical copper market itself, the Scrap Dealers are quintessential examples of indirect victims of antitrust injury. Although the copper distribution chain is exceedingly complex, even in the simplest possible version, an integrated producer such as Asarco will refine copper into cathode and sell it to a manufacturer, such as Viacom, Emerson, or Ocean View. The manufacturer will in turn transform the cathode into some product using copper and sell it down to the retail level. In the process, it may generate unused scrap copper, at which point the Scrap Dealers finally appear on the scene to buy the scrap. It is for these last purchases that the plaintiffs seek to recover damages. But distributors and manufacturers have already entered into monetary transactions involving this same copper, and indeed we are faced in this very case with suits filed by some of those manufacturers. It is apparent that these companies at the least have suf-

fered more direct injuries than the Scrap Dealer plaintiffs. This stands in marked contrast to *Sanner*, where the soybean farmers were clearly the most directly injured participants in the cash market because they were the only cash sellers of soybeans. *Sanner*, 62 F.3d at 927.

The speculative nature of the damages the Scrap Dealers have suffered also supports our conclusion that they cannot maintain this action. See *id.* at 542-43 (denying a claim that rested on an "abstract conception or speculative measure of harm"). The Scrap Dealers' economic experts have stated that they can tie a rise in the price of copper futures directly to price increases for physical copper through econometric analysis. Defendants argue to the contrary that a host of other factors are also at play, destroying the closeness of any link. Even accepting the Scrap Dealers' position on this point, as we must at this stage of the litigation, it is difficult to know whether they have suffered any economic loss at all as a result of the defendants' actions. After all, the Scrap Dealers, middlemen who resell their scrap copper soon after they purchase it, are alleging that the defendants' market manipulations caused the price of copper to increase steadily from 1994 to 1996. Therefore, on most or all the sales the Scrap Dealers made in that time frame, which they contend are inflexibly linked to prevailing Comex prices, they should have made a slight profit because of Sumitomo's actions. Only when the price of copper plummeted in June 1996 would the Scrap Dealers have taken a bath in the resale market. And depending on how much copper the Scrap Dealers had on hand as compared to the number of transactions they made as the price of copper was increasing, it is possible that some of them may have suffered no true economic loss at all. In short, the exact nature of the damages they have suffered is speculative.

The Scrap Dealers attempt to counter this problem by arguing that damages can be set simply by computing the difference between the price of copper that should have prevailed on a given day absent Sumitomo's manipulations and the actual price for every copper transaction. This assertion, however, plunges the Scrap Dealers headlong into conflict with the sixth *AGC* factor, the problems of duplicate damage recovery and complex damage apportionment. The Scrap Dealers argue that they—and all other commercial purchasers of physical copper—should be permitted to recover damages equal to three times the overcharge caused by Sumitomo's scheme for every single sale of copper in the mid-1990s. But this proposition ignores the fact that the same piece of physical copper may be resold many times in a given year as it is refined, distributed, turned into scrap, sold between scrap dealers, re-refined, and sold for scrap again. As mentioned above, every time a scrap dealer resold scrap copper during the two years at issue, it recouped the vast majority of its losses. Since defendants are not permitted to mount any sort of cost recovery defense along these lines, see *Hanover Shoe*, 392 U.S. at 491-94, this would cause the Scrap Dealers to receive a damages award far in excess of any economic loss the defendants caused them. While *Sanner* permitted farmers to recover their soybean losses, it did not let millers, wholesalers, or retailers of soybeans also assert claims. It would be a significant extension of *Sanner* to allow these plaintiffs to sue, and it is one we decline to make.

The Scrap Dealers repeatedly argue that there are no duplicate damages in this case because their pricing decisions are based exclusively on Comex prices rather than a pass-on of historical costs. We fail to see why this fact should lead us to ignore the Supreme Court's command to prevent the duplicate recovery of antitrust injuries wherever possible. *AGC*, 459 U.S. at 544; *Greater*

*Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 396 (7th Cir. 1993). The Scrap Dealers' contention that absent a pass-on of historical costs their injuries are "separate and distinct" defies economic reality. If a scrap dealer purchased a ton of copper when the Comex price was artificially inflated by $400, and the price subsequently rose another $200 prior to resale, it has reaped a $200 gain, not a $400 loss. The Scrap Dealers' own witnesses admitted that there is no pass-on only "if the current Comex price has moved in an adverse direction." Yet the evidence shows that Sumitomo's actions caused the Comex price to rise throughout the period at issue in this case, making us skeptical that the Scrap Dealers have suffered any real loss at all.

The fact that the Scrap Dealers here are further down the chain of copper users than others also will increase the economic complexity of apportioning damages. Even the marketing manager of Loeb admitted that such factors as "freight costs, the sizing, sorting, packaging, purity requirements, length of time it took to get paid, [and] the risk of getting paid" all factored into Loeb's pricing decisions. While it might be possible for economists to factor out each of these considerations for all prior sales involving copper, the Supreme Court has decreed a simpler solution: simply restrict the right to recover to those who are more directly affected by the defendants' actions. *UtiliCorp,* 497 U.S. at 208-11 (noting policy rationales for denying recovery even to those plaintiffs whose damages could be easily calculated). This description applies fully to the plaintiffs here. Because the Scrap Dealers have suffered an indirect injury causing them at best speculative damages that would lead to a strong possibility of duplicative recovery, we agree with the district court that they may not pursue their claims.

## B. *Viacom* and *Emerson* (No. 01-3485)

### 1.

Many of the successful arguments from *Loeb* are echoed by the defendants in the *Viacom* action, but after a careful review of the record we find that the facts of the latter case compel a different result. The defendants' first argument for denying recovery to Viacom and Emerson (to whom we will refer as "Viacom" except when distinctions between the two companies are important) is that Viacom has shown no evidence of direct and predictable harm stemming from the defendants' conduct. As we stated earlier, directness relates to the question whether there exists a chain of causation between a defendant's action and a plaintiff's injury or (in contrast) if the connection is based instead only on "somewhat vaguely defined links." *AGC*, 459 U.S. at 540. Global and CLR, the only defendants remaining in the *Viacom* action after Sumitomo's settlement, begin their attack by pointing out that the prices of copper cathode on the LME and Comex often diverged. We fail to see why this matters. Sumitomo purchased futures on Comex to drive up the price on that particular exchange artificially, and the prices Viacom paid for copper were directly based on Comex prices. The fact that Sumitomo also bought and sold futures on the LME and may have caused additional harms to physical copper purchasers who based their decisions on LME prices has no impact on Viacom's ability to recover under the *AGC* factors.

Next, the defendants rely on the fact that Viacom's purchases included not only a price linked to Comex but "a variety of discounts or premiums that, in response to changes in supply and demand, varied over time and among suppliers." The defendants' experts have opined that, through adjustments of premiums in response to supply and demand factors, the actual impact on the physi-

cal copper market of their illegal futures market activities is likely to be indirect and unpredictable.

While all of this might be so as a theoretical matter, on summary judgment it is our duty to evaluate the evidence in the record that Viacom presented. And that evidence paints a starkly different picture. Viacom has introduced into the record both its contracts and its suppliers' published premiums. After a careful review of these materials, we are convinced that Viacom has established direct injury. In its contracts, Viacom purchased all but a *de minimis* amount of copper through the two-part formula we described earlier, consisting of (1) a base price equal to the Comex first position copper settlement price, and (2) a cathode premium, negotiated on a monthly or quarterly basis. Over the six years at issue here, the settlement price fluctuated from about 75¢ to $1.40 per pound. During the same years, the premium ranged from 2.75 to 3.50¢/lb. (Viacom does not seek recovery based on changes in premium prices; the complaint is based only on those caused by variations in the base price.)

The district court ruled that the base price and cathode premium were "inseparable." After a careful review of the record in the light most favorable to the plaintiffs, we are unable to agree with this characterization. All of the contracts specify that the payment price is determined by adding these two separately described components, and the values of both numbers throughout the relevant time period should be available through discovery. The district court also seems to have thought that the premium could in some cases be a discount off the Comex price. There is no evidence to support this; to the contrary, all of the evidence, including defendants' counsels' concession at oral argument, indicates that the premium was always a positive number. While Viacom appears to have been awarded volume and cash payment discounts in some instances, there is no indication that

these discounts were tied to market conditions, and the defendants do not focus on such discounts in their briefs. Furthermore, the cathode premium was a small fraction of the Comex price. In fact, the evidence shows that as the Comex price increased, the premium also increased. Thus, there is no possibility that the two components "offset" or that the premium somehow compensated for the defendants' manipulated price inflation. (Even if, counterfactually, the Comex price had for example risen by 65¢ and, to compensate, the base price dropped a penny, this could at best represent a mitigation of damages. But this would not make the injury any less direct.) The district court's conclusion on this point, which relied mainly on the testimony of an expert who had not even looked at Viacom's contracts, is both factually mistaken and fails to take the evidence in the light most favorable to Viacom. The presence of a small cathode premium does not negate the fact that the prices of cathode and cathode futures "tend to move in lockstep." Instead, the price reference in Viacom's contracts supports just such lockstep linkage. Our case law has never required that the cash and futures prices be identical to support recovery. It is only necessary that the relationship be direct, as it is here. See *Sanner*, 62 F.2d at 929.

Furthermore, the experts note that Comex quotes 24 different exchange prices at any given time and that the defendants' actions could have affected each of those prices differently. Accepting the truth of this statement, we do not see why it compels a finding that Viacom's injury is indirect. According to the record evidence, out of this menu of prices, Viacom used just one (the monthly settlement price) as the basis for all but a minuscule number of its contract purchases, and Emerson used only two. While acknowledging this, the defendants contend that other cathode purchasers could have used different or widely varying systems. Perhaps they did, and if so perhaps they should be found to be improper plaintiffs

under the antitrust laws, though that is an issue for another day. But this fact does not weaken the direct causal chain between the defendants' actions and these particular plaintiffs' harm and is no more reason to deny Viacom and Emerson recovery than the fact that some purchasers might have bought cathode at prices not tied to those on either Comex or the LME.

Similarly, we reject the defendants' argument that because a number of Viacom's contracts contained clauses permitting the parties to renegotiate the base price if they believed that Comex prices did not accurately reflect market conditions, Viacom's injuries are somehow remote and indirect. It is undisputed that, because of the success of the defendants' conspiracy, Viacom and its integrated suppliers were never aware of the artificial Comex inflation and so never took advantage of this clause. Instead, Viacom based all of the purchases for which it seeks recovery directly on Comex.

We also believe that, contrary to the defendants' contentions, our holding on this point is entirely consistent with the Second Circuit's decision in *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d Cir. 1980). There, the plaintiff, a refiner of scrap copper, alleged that the defendant-integrated producers had conspired to keep the price of refined copper low and that this conspiracy injured it by artificially raising the price of scrap. *Id.* at 12. The court found the injury indirect because it "depend[ed] upon a complicated series of market interactions," including the actions and pricing decisions of refiners, fabricators, dealers, speculators, and consumers of copper. *Id.* at 13. Such "conjectural theories of injury and attenuated economic causality" were enough to render Reading's injury indirect. *Id.* at 14.

Other than the fact that both *Reading* and the present case involve price-fixing conspiracies in the physical cop-

per market, we find little similarity between them. The injury here does not depend on the speculative actions of innumerable market decision makers. It flows instead directly from the contracts between Viacom and its suppliers. It is this contractual linkage, absent in *Reading*, that prevents other market variables from miring a trier of fact here in "intricate efforts to recreate the possible permutations in the causes and effects of a price change." *Id.*

In sum, Viacom's contracts and the other record evidence establish a direct relation between the defendants' illegal scheme and Viacom's harm. The contract price it paid its suppliers for copper was directly and explicitly based on the Comex monthly settlement price, and therefore the defendants' manipulations directly and predictably had an impact on that price. *Amarel v. Connell*, 102 F.3d 1494, 1512 (9th Cir. 1997) (injury direct where price of milled rice directly affected price of paddy rice); *Sanner*, 62 F.3d at 929. Any variations in the cathode premium moved in the same direction as the manipulation and could not have limited or mitigated this harm. For these reasons, Viacom has established the directness element of *AGC*.

**2.**

We turn next to the district court's other major reason for granting the defendants summary judgment: its belief that opening the door to Viacom's suit would inevitably lead to either duplicate recovery or complex damage apportionment. See *AGC*, 459 U.S. at 544. The court cited at least three manifestations of this problem, all involving Viacom's integrated suppliers, such as Asarco. First, it believed that Viacom's claim would duplicate Asarco's because Asarco could assert claims for its raw material purchases from third parties, and those raw material

prices are tied to Comex. Second, because Asarco purchased some cathode from third parties, both it and Viacom would be permitted to recover and duplicate each other's damages. Third, Viacom's claim would duplicate Asarco's because Asarco hedged by purchasing put options on Comex. In addition to those three points, the court noted that Asarco has recovered damages in a California state court class action, and it thought that this too should preclude Viacom from recovering.

We begin with the defendants' claim that Asarco's purchase of raw materials, such as ore, concentrate, blister, and anode, all of which it transformed into cathode, should bar recovery. This does not follow. Practically every product is created through the use of some kind of raw materials, but that fact does not prevent the direct purchaser of the finished product from suing its manufacturer under the antitrust laws, as long as the direct purchaser is not trying to attack a price-fixing arrangement at the raw materials level. The defendants' own experts testified that while raw material prices "may be indirectly affected" by price manipulations, a squeeze or corner on cathode—the only copper product traded on Comex and the LME—would not directly harm purchasers of these raw materials. Instead, raw material prices vary widely and contain various discounts off the Comex price to account for such factors as the expected cost of conversion into cathode, which in turn varies based on supply, demand, and current refining and smelting capacity.

We agree with the broad proposition that a party cannot recover when others more directly injured are better able to state a claim. *AGC*, 459 U.S. at 544-45. Indeed, we have just applied this very principle to deny recovery to the Scrap Dealers, who are farther down the chain of resale, even though scrap prices too are tied to Comex. For parallel reasons, raw materials purchasers are also ill-

suited to bring an antitrust claim. Permitting both raw materials purchasers and cathode purchasers in the same line of distribution to recover would lead to duplicate damages in violation of the *Illinois Brick* rule. The solution to this problem, however, is not to deny a right to recover to everyone. Such a draconian rule would give a green light to antitrust scofflaws to conspire to fix prices in a particular market and would create incentives to engage in antitrust conspiracies in markets with complicated distribution structures. Instead, the proper course is to recognize only the best of the several potential plaintiffs who otherwise satisfy the requirements for bringing suit under the antitrust laws. Because raw materials prices will vary in comparison to Comex prices much more than will the price of physical cathode, physical cathode purchasers such as Viacom are better situated than raw materials purchasers to pursue a claim in the physical market. This logically implies that raw materials purchasers up the chain from cathode sales could not satisfy *AGC,* just as we found to be the case for the downstream Scrap Dealers. In between, however, lies the physical market transaction at the heart of the defendants' scheme—the purchase of cathode. There are no better parties than these purchasers to pursue a claim, and it is therefore they who are proper plaintiffs.

More bite lies in the argument that recovery should be denied because some of the cathode Asarco sold Viacom was purchased before, although this claim is not as strong as it might at first appear. As the district court noted, some if not most of the cathode Viacom purchased had never before been purchased in cathode form. Asarco sold Viacom 510 million pounds of cathode between 1990 and 1996. During that time frame, Asarco refined 6.4 billion pounds of cathode and purchased 153 million pounds from third parties, about 2.3% of its output. Because copper is fungible, one cannot tell whether any given Viacom

purchase of cathode consisted of cathode refined by Asarco or previously purchased product.

We do not believe the mere existence of third-party cathode presents such a risk of duplicate recovery as to justify the extreme step of denying recovery altogether. Had the Board of Trade in *Sanner* produced evidence that farmers on some rare occasions bought soybeans from neighboring farms and then resold them along with the soybeans they grew themselves, that would not have provided a reason to deny recovery entirely. Similarly, if Viacom can prove at trial that 97.7% of all copper Asarco sold it was cathode it had refined itself, then Viacom should be permitted to recover 97.7% of its proved damages from cathode purchases. *Cf. Paper Sys., Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 633 (7th Cir. 2002) (carving out indirect purchases while still leaving open possibility of recovery for direct purchases). The physical copper market is complicated, but not so complicated that one cannot estimate to a reasonable degree of accuracy the amount of damage a party has sustained. It is certainly acceptable through expert economic testimony to make a reasonable estimation of actual damages through probability and inferences. See *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969). "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty it would be a perversion of fundamental principles of justice to deny all relief to the injured person." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). While we are not permitted to make *complex* damage apportionments in antitrust cases, *AGC*, 459 U.S. at 544, nothing about these calculations is inordinately complex. One need only know two pieces of information: the amount of cathode purchased by Viacom and the amount of cathode purchased and sold by those who sold cathode to Viacom. From there, reasonable estimates of damages

are the order of the day. Because this estimation is not overly complex and will not lead to duplicate damages, it provides a sufficient basis at this stage for the case to proceed to the merits.

The defendants' next major attack rests on hedging. Commodities exchanges function in part to protect participants in a physical market by shifting some of the risk (and damage) caused by fluctuations in price to participants in the futures market. Extending this principle, Global and CLR claim that through an extremely complicated set of economic interactions between the cash and futures markets, the damages experienced in the physical cathode market will be duplicated in their entirety by damages suffered in the futures market. Therefore, only futures traders, and not cash market participants, should be permitted to recover.

The hedging theories advocated by the defendants are based on economic theory, with no specific application of that theory here that would correlate sales in the cash market and sales in the futures market. Notably, Viacom's individual purchases from its suppliers were not hedged. Neither Viacom nor Asarco purchased a futures contract as a hedge every time they exchanged copper. Had they done so, then perhaps one might be able to "match" each physical market transaction to a futures contract sale and argue that the opportunity for a trader to recover the overcharge in a federal lawsuit should preclude recovery for the overcharged physical market participant. Emerson's supplier, Phelps Dodge, did hedge some of its sales to Emerson. On remand, the district court should explore further whether these hedging transactions would lead to some degree of duplicate recovery and a corresponding need to reduce damages. Nevertheless, since our review of the record indicates that not all of Phelps Dodge's sales were hedged, we conclude that Emerson is an appropriate plaintiff for the same reasons as Viacom.

In any event, the kind of futures matching the defendants' postulate does not reflect the way that most hedging works in the copper futures market. Asarco did not buy futures. Instead, it purchased put options. Put options are strategic hedges designed to protect against a general risk of declining cathode prices. With a put option, Asarco had the right, but not the obligation, to sell a futures contract if the price fell below a certain "strike" price. See *United States v. Catalfo*, 64 F.3d 1070, 1072 (7th Cir. 1995). But as the defendants were artificially inflating the price of cathode throughout the period at issue here, the price never would have fallen below the strike price. Therefore, no sale ever would have gone forward and the only damages Asarco would have suffered from the conspiracy would have been the cost of the put option, or, more properly, the amount by which the price of the put option changed because the price of copper was artificially high.

The defendants and their experts have made no attempt to correlate the damages Asarco could theoretically recover on the futures market for its put options to the specific damages sought here by Viacom, and the relationship is far from intuitively obvious. Instead, the experts trace the potential for hedging by numerous parties upstream and downstream from Viacom and contend that because so many participants in the copper industry use so many different forms of hedging there will be "inevitable" duplication between the cash and futures markets.

This sort of potential duplication bears no resemblance to the duplication rejected in *Illinois Brick* and *AGC*, 459 U.S. at 544, nor do we think that it independently provides a reason to deny recovery to Viacom. In *Illinois Brick*, any "pass-on" of damages would (because of *Hanover Shoe*) already be taken into account in its entirety in the recovery to another potential party, the direct purchaser. 431 U.S. at 737-38. This simply is not the case here. Asarco strategically hedged only about half its output. The de-

fendants claim that potential hedging by those parties to whom Viacom sold and from whom Asarco purchased raw materials is also relevant, but this cannot be so under *Sanner*. There we held that injuries incurred in futures market purchases not linked to any particular cash market purchases did not "duplicate" and were not more "direct" than the cash market injuries. 62 F.3d at 929-30. Because there are two separate markets, each with compensable injuries, the opportunity for recovery in one market does nothing to alleviate the harm in the other. For similar reasons, the fact that Comex futures traders have received money in a now-settled lawsuit says nothing about the ability of Viacom or other similarly situated plaintiffs in the cash market to recover.

Finally, the defendants note that Asarco and three of the manufacturers' other suppliers have recovered in a lawsuit brought in California state court. This lawsuit was brought pursuant to California law, which permits suit by indirect purchasers. *Union Carbide Corp. v. Superior Ct.*, 679 P.2d 14, 16 (Cal. 1984). However, the supposed "duplication" here comes from different bodies in our federal system seeking to remedy separate harms. It presents no risk of duplicate recovery for the same injury under the same law and is thus no bar to the plaintiffs' recovery. See *Browning-Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989) (upholding award of both federal antitrust and state tort damages); *California v. ARC Am. Corp.*, 490 U.S. 93 (1989) (permitting states to require offenders to pay both state damages to indirect purchasers and federal treble damages to direct purchasers). If the resolution of the state court action poses a problem at all to these plaintiffs, it would be in the nature of claim or issue preclusion. See *Matsushita Electric Indus. Co. v. Epstein*, 516 U.S. 367 (1996); *Marrese v. American Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985). It is possible that the defendants have waived

their right to assert any such defense; it is not mentioned in their briefs before this court. Accordingly, we express no opinion at this time on the merits of any preclusion argument.

In sum, of all participants in the physical market, Viacom and other first purchasers of cathode are the only plaintiffs possibly situated to recover damages against the defendants for the anti-competitive harms they have inflicted on the physical market for copper cathode. Faced with the option of permitting a clear, non-speculative harm to the cash market to go unremedied or of allowing the plaintiffs' suit to go forward, we elect the latter. As narrowed to first purchases, there is no danger of duplication of recovery, and so, under *AGC* and *Sanner*, the claim should proceed to trial.

### 3.

The final broad claim of the defendants is that recovery of damages in this case simply would be too speculative and complex to warrant allowing this suit to proceed. *Cf. AGC*, 459 U.S. at 542. Based on the evidence adduced by Viacom, however, we disagree. The main complication will come from attempting to discern how much of the Comex price of copper at a given time represented an overcharge due to the defendants' manipulation and how much stemmed from normal economic forces. This difficulty, however, occurs in every price-fixing case. It is no different from the task of gauging the damages recoverable by Comex futures traders, whom defendants have conceded to be proper plaintiffs. Through discovery, economic experts can evaluate the impact of the defendants' illegal actions on the futures market and come to reasoned conclusions. *Cf. Sanner*, 62 F.3d at 930 (rejecting claim that damages analysis in a market manipulation is "beyond the ken of the federal courts"). At that point,

recovery could be calculated by reviewing all of Viacom's contracts (assuming they are similar to the ones already in the record) and assessing damages based on the already computed overcharge. Since the only other factors involved in setting the price of Viacom's cathode are items which have no relation to the Comex price, such as freight charges and cash payment discounts, and the cathode premium, for which Viacom does not seek to recover, there should be no problems as a theoretical matter with making these calculations. The mere fact that each individual transaction relevant to an antitrust scheme must be examined on a case-by-case basis to assess damages does not thereby render those damages speculative. *American Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1059 (9th Cir. 1999).

We fully recognize that perfecting such economic analysis, tracking every pound of cathode refined or purchased by Viacom's suppliers, and locating every cathode contract Viacom entered into over a six-year span will not be easy. But complex litigation is hardly new for the federal courts, whether it is in the field of antitrust, environmental clean-ups, pension law, or accounting frauds. The key here is that the damages are not inherently speculative in the sense that *AGC* used that term. See 459 U.S. at 542. Nor, as in *Illinois Brick* or *Hanover Shoe*, is a party asking a jury or the district court to perform some form of econometric analysis to deduce whether all, some, or none of an overcharge was passed on down a chain of distribution. *Illinois Brick*, 431 U.S. at 727. Instead, one need only determine through available records what percentage of cathode bought by Viacom represents first purchases. This is not speculative or complex, only time-consuming, and we are confident that the parties and their counsel are up to the task.

The defendants' entire case theory, apparent not only here but also through their discussion of duplication

and hedging, seems to be the troubling one because their scheme was *so* evil, went undetected for *so* long, and caused *so* much economic loss throughout the cash market, that we should simply give them a pass from the antitrust laws. This is not now and never has been the law. Since the days of *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927), it has been established that in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages. While we fully agree that we should not use the massiveness of defendants' conspiracy as an excuse to punish them unduly (by, for example, permitting the Scrap Dealers in *Loeb* to recover for harms that would duplicate those of Viacom), the sensible solution is to let one—but only one—level of purchasers in the physical copper market recover. Based on all the evidence available on summary judgment, the best plaintiff in this market is the first purchaser of copper cathode, and Viacom and Emerson are prototypical examples of such plaintiffs. The district court erred in dismissing the case at this stage, and we must therefore reverse its judgment.

## C. *Ocean View* (Nos. 01-3229, 01-3230)

We turn to the final plaintiff, Ocean View. We have already rejected the defendants' principal argument for affirming summary judgment in this case, that the action is barred by the *Illinois Brick* direct purchaser rule. For the same reasons discussed in connection with Viacom's action, there is no party along a chain of distribution between Ocean View and any of the defendants who can recover for an alleged overcharge. Therefore, *Illinois Brick* is inapplicable. Instead, this case is controlled by the basic premise of *Sanner*, 62 F.3d at 929-30, which holds that a cash market participant injured by

a party's illegal actions in the futures market may, in some instances, sue that party under the federal antitrust laws. The controlling factors in this inquiry are those set out in *AGC*, 459 U.S. at 537-45. The defendants allege that under an analysis of these factors, Ocean View's claim should still be precluded, while Ocean View contends that it should be entitled to recover for every copper rod it has ever purchased, or, in the alternative, that it may recover at least for those instances where it was the first purchaser of copper in cathode form.

As with the Scrap Dealers, we must reject Ocean View's proposition that it can recover for rod manufactured from cathode purchased by others, such as its semi-fabricators. Such an injury would be indirect because the semi-fabricator would serve as a more immediate victim of the antitrust violation intended to affect the cash and futures markets for cathode. *AGC*, 459 U.S. at 541-42; *supra* at 22-23. Semi-fabricators who purchased cathode would stand in shoes similar to those of Viacom, purchasing large quantities of cathode to reshape and sell as rod or wire. Because they are well-situated to bring any claim for inflation in the physical market, there is no need for Ocean View, as a more remote party, to step in "to vindicate the public interest in antitrust enforcement." *AGC*, 459 U.S. at 542.

Additionally, granting recovery to both a semi-fabricator for its cathode purchase and Ocean View for its purchase of that same cathode reshaped as rod would lead to either duplicate recovery or complex damage apportionment in violation of the principles underlying *AGC*. 459 U.S. at 544. We have already rejected the claim that the copper market should not be subject to a ban on duplicate recovery because copper pricing decisions are based on Comex and not a "pass on" of historical costs, *supra* at 24-25. To avoid such duplicate recovery one must either attempt to apportion damages along a chain of distribu-

tion, forbidden by *AGC*, or deny the right to sue to all but one plaintiff along the chain of distribution.

The best-situated plaintiff to recover is the first purchaser of copper cathode, the specific commodity the defendants targeted in their futures market conspiracy. For such a plaintiff, it is possible both to avoid duplicate recovery problems and at the same time to ensure that antitrust harm perpetrated in the cash market will not go unremedied. Based upon on our review of the record, we are satisfied that in at least some cases Ocean View did purchase cathode refined by integrated producers. The existence of such purchases is enough to get Ocean View in the door; recovery should not be denied simply because a plaintiff may not receive damages as high as it would like. The quantity of such sales, and thus the eventual damages Ocean View might get if it manages to prove the rest of its case, can await further discovery. Like Viacom, Ocean View will have the burden of ascertaining what percentage of the cathode sold by these producers was refined by them and not purchased from third parties. If, as defendants fear, many of these records are lost, that fact will come out in discovery, and they may move for a missing evidence instruction or perhaps even summary judgment on the merits.

We have already rejected most of the other claims the defendants make for denying Ocean View recovery, including the proposition that the integrated producers' purchase of copper raw materials should somehow render them improper plaintiffs, *supra* at 31, and the claim that hedging on the copper futures markets by some physical market participants renders the injury indirect or duplicative, *supra* at 34-36. Finally, we have found that the damages claimed are not too speculative or complex, *supra* at 37-38.

At this point we can think of only one possible distinction between Ocean View and Viacom that deserves further comment. That is the fact that while Viacom purchased

cathode, Ocean View bought cathode that had been tolled into rod. The parties do not focus on this distinction much in their briefs, and the defendants concede that there is no physical difference between cathode and rod other than the product's shape. Based upon our review of the contracts in the record, the price Ocean View paid its integrated producers for rod appears to be identical to that paid by Viacom for cathode except for the existence of an additional rod premium. We assume, since the defendants do not contend otherwise, that like the cathode premium, the rod premium is a small fraction of the total price paid and tends to increase as the Comex price increases, so that it does not in some way offset the Comex inflation or render the injury indirect. In that case, the similarities between cathode and rod are close enough that, in instances where the same integrated producer refines raw materials into cathode and then shapes it into rod, Ocean View, as the first purchaser after the materials are formed into cathode, can state a claim, regardless of whether that copper is then in the form of cathode or rod. *Cf. In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 17-18 (3d Cir. 1978) (finding no distinction for *AGC* purposes between price-fixed sugar and candy incorporating that price-fixed sugar sold into the market for the first time).

## VI.

In addition to their points under *Illinois Brick* and *AGC,* the various plaintiffs make arguments specific to their own cases. Most of these involve procedural issues. We consider these points in turn, on an issue-by-issue basis.

### A.  RICO and State Law Claims

We begin once again with the *Loeb* action. Our determination that the *AGC* factors prevent the Scrap Dealers

from pursuing their antitrust claims disposes of their remaining claims against Sumitomo and Global for violations of RICO and state law. It is also dispositive of all claims against JPMorgan Chase.

The district court dismissed the Scrap Dealers' RICO claims on the ground that the *AGC* factors apply equally to RICO. The Scrap Dealers, however, argue that even if their antitrust claim fails, their RICO case should proceed. This claim lacks merit. Civil RICO was modeled after the Clayton Act. *Holmes v. Security Investor Protection Corp.*, 503 U.S. 258, 267-69 (1992). To satisfy its requirement of proximate causation, the Scrap Dealers must allege a relation between their injury and the defendants' violation that is neither indirect nor remote. *International Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Phillip Morris, Inc.*, 196 F.3d 818, 825 (7th Cir. 1999) (applying *AGC* factors to a proximate causation analysis). Since we have already determined that the Scrap Dealers' injury is too indirect and remote under *AGC* for antitrust purposes, we conclude that the relation is similarly too remote for RICO purposes.

The Scrap Dealers also assert that the district court erred in finding that they had abandoned their state law claims. On this point, they appear to be correct. There is certainly no evidence in the record that the Scrap Dealers voluntarily dismissed or failed to pursue their various state law claims. The defendants argue that these claims were abandoned when the Scrap Dealers attempted to certify a class for the federal antitrust claims but not for the state claims. But no inference of abandonment should flow from a limited request for a class action; to the contrary, FED. R. CIV. P. 23(c)(4)(A) specifically recognizes that "an action may be brought or maintained as a class action with respect to particular issues." It would be entirely consistent with the rule to seek certification on issues governed by federal law,

while declining to do so for more particularized state law issues. Nevertheless, the fact remains that we have dismissed all of the Scrap Dealers' federal claims against Sumitomo and Global. Since the Scrap Dealers have asserted no independent basis for federal subject matter jurisdiction, it is entirely appropriate to dismiss the state law claims, though without prejudice. See 28 U.S.C. § 1367(c)(3); *Oates v. Discovery Zone*, 116 F.3d 1161, 1173 n.12 (7th Cir. 1997).

### B.  Issue Preclusion: JPMorgan Chase

The district court dismissed the Scrap Dealers' claims against JPMorgan Chase on issue preclusion grounds. To prove that issue preclusion applies, the defendant must establish that (1) the plaintiff was fully represented in the prior litigation, (2) the issues to be precluded are identical to those in the prior litigation, (3) the issues were actually litigated and decided on the merits, and (4) resolution of the issue was necessary to the judgment. *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 178 (7th Cir. 1995). The Scrap Dealers' claims against JPMorgan Chase arise from an alleged conspiracy between JPMorgan Chase and Sumitomo in which JPMorgan Chase's metals desk somehow furthered the conspiracy through its own copper purchases on the LME. The issue the defendants sought to preclude, that of the Scrap Dealers' ability to recover as a proper plaintiff under the antitrust laws, was actually litigated and decided on the merits in their suit against Sumitomo. That is enough to bind the Scrap Dealers, who have now had their day in court, with respect to JPMorgan Chase as well.

The Scrap Dealers argue, however, that their day in court was flawed, because they did not have an opportunity to litigate these issues fully before the district court. Their only support for this contention is the fact

that the district court turned Sumitomo's motion to dismiss into a summary judgment motion without notice to them. As we have already noted, this action by the district court, while in error, did not prejudice the Scrap Dealers. The antitrust issues were fully litigated by counsel, albeit at the class certification stage. Besides this, the district court gave the Scrap Dealers an opportunity for a hearing prior to dismissing the JPMorgan Chase claims at which they were invited to bring forth any additional arguments that would call into question the district court's prior grant of judgment to the defendants. The Scrap Dealers produced no new evidence at that time that would call into question the factual basis for that determination. Therefore, we affirm the district court's decision to dismiss all claims brought by the Scrap Dealers against JPMorgan Chase on issue preclusion grounds.

## C.  Statement of Claim Against CLR

CLR advances one final argument in support of the judgment in both *Viacom* and *Ocean View*, which applies only to itself and not to its co-defendants. The district court stated in the *Viacom* action that, while it would not "address the issue in any detail," it believed that Viacom had made an inadequate showing that CLR's activities in any way affected the prices Viacom paid for copper. CLR urges this as an alternate ground for affirmance.

The procedural history of this argument is complex and seems to have engendered a great deal of enmity between the parties. The parties filed cross-motions for summary judgment on the standing question in the *Viacom* action. In its lengthy joint motion with Global, CLR never argued that its role in the conspiracy was too attenuated to have directly affected the Comex price. The issue was first raised in CLR's response to Viacom's cross-motion.

Viacom, in reply, pointed to evidence in the record that addressed this new argument. The district court struck these submissions as untimely. This, however, was in error. Viacom had no obligation to produce specific evidence of CLR's role to survive CLR's motion for summary judgment since the issue was never raised by CLR at that stage. *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 604-05 (7th Cir. 1999). Because CLR raised this argument in an untimely manner, the district court should not have considered it as a ground for summary judgment without giving Viacom "notice and a fair opportunity to present arguments and evidence in response." *Id.* By striking the materials Viacom submitted, the district court denied just that opportunity. Of course, since we are remanding this case on other grounds, the issue may resurface again after further discovery. At that point, considering all evidence in the record, the district court may properly evaluate—after considering all record evidence—whether either Viacom or Ocean View has presented enough to connect CLR to any violation of the antitrust laws. For the foregoing reasons, we also deny CLR's motion to strike.

### D.  Aiding and Abetting: JPMorgan Chase

Another minor issue crops up only in *Ocean View*, but it too can be disposed of easily. JPMorgan Chase asserts that the district court incorrectly denied its motion to dismiss on the ground that the complaint failed to state a claim against it because it only aided and abetted the conspiracy between Sumitomo and Global. But Ocean View is not attempting to state an "aiding and abetting" case. Its allegation is that JPMorgan Chase was a participant in the conspiracy to manipulate the copper market. To state such a claim, Ocean View need only prove that JPMorgan Chase knew Sumitomo intended to restrain trade, intended that

trade be restrained, and materially contributed to that restraint. 7 Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶1474a (1986); *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 470 (1962). A broad reading of the complaint alleges this and more. It states that JPMorgan Chase, aware that Sumitomo was manipulating futures prices, provided services and loans at well above-market prices to finance and hide Sumitomo's activities. JPMorgan Chase also allegedly stonewalled and lied to regulators and otherwise helped Sumitomo in an attempt to avoid investigations, all the while profiting handsomely on its deal. Of course, after merits discovery, it may come to pass that Ocean View lacks the evidence to establish any of these claims. But accepting the allegations as true, it is entitled to proceed.

### E. Reinstatement of Claims

Only a few brief housekeeping matters remain. In both *Viacom* and *Ocean View*, the district court also granted the defendants summary judgment on their RICO and fraud claims because RICO contains rules similar to the Clayton Act for identifying proper plaintiffs. *International Bhd. of Teamsters*, 196 F.3d at 825. Having found that the plaintiffs here may pursue their antitrust claims, the RICO claims must be reinstated as well. The same goes for the state law claims. They were dismissed without prejudice in *Viacom* only because all federal claims had dropped out of the case. Finally, in *Ocean View*, the district court dismissed Ocean View's claim under Rhode Island state law on the ground that Rhode Island law imposed standing requirements similar to those of federal law. Expressing no opinion on the merits of that determination, we note that since we have found that Ocean View may proceed on at least some of its claims under federal law, the dismissal of the Rhode Island claim on similar grounds must be reconsidered.

## VII.

To summarize, we MODIFY the dismissal of the state law claims in No. 00-3979 to reflect that this dismissal was without prejudice. In all other respects we AFFIRM the judgment of the district court. We also AFFIRM the judgment in No. 01-1148. On the other hand, we find that Viacom, Emerson, and Ocean View are not indirect purchasers under *Illinois Brick*, and their injury is direct, predictable, and unlikely to produce duplicate recovery or speculative damages. Therefore, in Nos. 01-3229, 01-3230, and 01-3485, we REVERSE the judgment of the district court and REMAND for further proceedings.

CUDAHY, *Circuit Judge*, concurring in Nos. 00-3979 and 01-1148 and concurring in the judgments in Nos. 01-3485, 01-3229 and 01-3230.  I join in the outcomes reached by the majority in the several cases, but I write separately to question the appropriateness of finding a "lockstep" relationship between the copper futures and cash markets in the analysis of the claims of Viacom, Emerson and Ocean View.

The analysis and outcome in *Sanner* (which relied on the allegations of a complaint, not a summary judgment record) were based on the thesis that the futures market and the cash market tended to move in "lockstep." Thus, the relationship of futures prices of soybeans on the Chicago Board of Trade and the cash price of soybeans to be realized by farmers could be assumed to be simple, direct and absolutely predictable. "The futures market and the cash market for soybeans are . . . 'so closely related' that the distinction between them is of no consequence

to antitrust standing analysis." 62 F.3d at 929. Based on the complaint, there could be no question that a given manipulation of the futures market produced a precisely proportionate consequence in the cash market.

This is hardly the case with the Comex and the market for physical copper. Even though the majority attempts to minimize the departures from a fully direct relationship between the futures and the physicals market (and takes issue with the more critical analysis of these relationships by the district court), under either view "lockstep" becomes more a slogan than a fact. And, of course, it was the existence of a "lockstep" relation that apparently excused *Sanner* from the strictures of *Illinois Brick v. Illinois*, 431 U.S. 720 (1977) and squared it with *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983). The existence, in the case before us, of a negotiable premium (or discount) as part of the price is enough in itself to remove this relationship from the "lockstep" category. And, if the language of *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 216 (1990) about the undesirability of exceptions to *Illinois Brick* were to be applied here, the outcome might be in doubt.

With respect to the possibility of duplicative recovery, *Sanner* is also quite distinguishable. There the plaintiff-farmers produced the commodity, bought none of it and there was no trade in any precursor raw material. Here the plaintiff-manufacturers bought from integrated producers, which purchased from others substantial quantities of copper cathode and pre-cathode copper raw material (the price of which also tended to follow the copper futures market).

I believe, therefore, that the case before us, although it seeks to apply *Sanner*'s principle, may be a major step beyond *Sanner*. The outcome, however, may be justified

insofar as there is sufficient evidence that the defendants engaged in massive physical cathode transactions and intended to manipulate physical prices as well as futures prices and thus to injure purchasers such as the plaintiffs. *See Sanner*, 62 F.3d at 929 ("even if we were to assume . . . that there is a distinction between markets that is relevant to antitrust standing, the farmers here have alleged that one of the CBOT's objectives in adopting the Resolution was to prompt a price decline in the cash market for soybeans.").

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
