### In re MERCEDES–BENZ ANTI-TRUST LITIGATION.

### No. 99–4311 (WHW).

United States District Court,
D. New Jersey.

April 12, 2005.

Lisa J. Rodriguez, Nicole M. Acchione, Trujillo Rodriguez & Richards, LLP, Haddonfield, NJ, for Petitioner.

Richard Samuel Mazawey, Law Offices of Richard Mazawey, Clifton, NJ, for Movants.

James J. Shrager, Norris, McLaughlin, Marcus, Somerville, NJ, pro se.

Lisa J. Rodriguez, Trujillo Rodriguez & Richards, LLP, Haddonfield, NJ, Jeffrey W. Herrmann, Cohn, Lifland, Pearlman, Herrmann & Knopf, LLC, Saddlebrook, NJ, for Plaintiffs.

Michael S. Waters, McElroy, Deutsch, Mulvaney & Carpenter, LLP, William F.

Maderer, Saiber, Schlesinger, Satz & Goldstein, Esqs., John Alan Adler, Hellring, Lindeman, Goldstein & Siegal, Esqs., Irvin M. Freilich, Robertson, Freilich, Bruno & Cohen, LLC, Robert B. Nussbaum, Saiber, Schlesinger, Satz & Goldstein, LLC, Newark, NJ, Thomas M. Madden, Hack Piro O'Day Merklinger, Wallace & McKenna, Ronald B. Weisenberg, Greenberg Traurig LLP, Philip R. Sellinger, David Jay, Greenberg Taurig, LLP, Eric Lewis Chase, Bressler, Amery & Ross, Esqs., Florham Park, NJ, Andrew P. Napolitano, Dreier LLP, James A. Moss, Herrick, Feinstein, LLP, New York City, David M. Watkins, Closter, NJ, Robert J. Kipnees, Lowenstein Sandler, Stephen Noah Dermer, Lowenstein Sandler PC, Charles Caranicas, Vedder, Price, Kaufman & Kammholz, Laurence B. Orloff, Orloff, Lowenbach, Stefelman & Siegel, P.A., Bonnie J. Mota, The Margolis Law Group Firm LLC, Roseland, NJ, Peter A. Efros, Efros & Wopat, Red Bank, NJ, Michael McLaughlin, Wasserman Jurista Stolz, Millburn, NJ, Robert C. Chapin, Pollock, Montgomery & Chapin, PC, Bedminster, NJ, Thomas L. Weisenbeck, Bressler, Amery & Ross, Morristown, NJ, David S. Stone, Boies, Schiller, & Flexner, Esqs., David M. Taus, Law Offices of Francis J. De Vito, Michael S. Meisel, Michael N. Morea, Cole, Schotz, Meisel, Forman & Leonard, P.A., Robert Montecallo, Biagiotti, Marino & Montecallo, PC, Hackensack, NJ, Jay Joseph Friedrich, Gallo, Geffner Fenster, P.C., Paramus, NJ, Gordon C. Strauss, Law Offices of Gordon C. Strauss, Joseph D. Priory, Princeton, NJ, William E. Goydan, Wolff & Samson, PC, West Orange, NJ, Martin G. Margolis, The Margolis Law Firm, P.A., Verona, NJ, Christopher Iannicelli, Boies, Schiller & Flexner, LLP, Short Hills, NJ, Franklyn C. Steinberg, III, Steinberg Law Offices, Somerville, NJ, for Defendants.

## OPINION

WALLS, District Judge.

This matter is before the Court on defendants' motion for partial summary judgment to dismiss the claims of the lessee plaintiffs. Oral arguments were held on January 27, 2005.

## FACTS AND PROCEDURAL BACKGROUND

The basic facts underlying plaintiffs' Complaint are set forth in this Court's opinion reported at *In re Mercedes-Benz Anti-Trust Litigation*, 157 F.Supp.2d 355 (D.N.J.2001). In short, plaintiffs allege that Mercedes–Benz USA (MBUSA), the national distributor of Mercedes–Benz automobiles, each of its local dealers in New York City, southern New York, western Connecticut and northern New Jersey suburbs, and the accountant Sheft Kahn conspired to fix the prices of new automobiles sold or leased by them to consumers from February 1992 to August 1999. The Complaint has survived a motion to dismiss and the matter has been certified as a class action pursuant to Fed.R.Civ.P. 23(b)(3). On May 14, 2004, MBUSA filed a motion for partial summary judgment to dismiss the claims of lessee plaintiffs. The defendants who joined this motion are Beifus Motors, Continental Motors, Inc., Country Imported Car Corp., David Michael Car Corp., Friendly Country, Inc., Helms Brothers, Inc., Mercedes–Benz Manhattan, Inc., Mercedes–Benz of Morristown, Midstate Motor Car Corp. d/b/a Millennium Automotive Group, Pepe Motors, Corp., Princeton Motorsport, Inc., Ray Catena Motor Car Corp., Sheft Kahn & Co., Sovereign Motor Cars, Ltd. and Watson Enterprises Inc.

The issues raised in this motion deal with those class members who leased new Mercedes–Benz vehicles. And so, the

facts material to this motion are those dealing with lease transactions that took place during the class period and the relationship between MBUSA and Mercedes–Benz Credit Corporation ("MBCC"), a leasing and finance company. The following facts are undisputed unless noted.

MBUSA imports U.S. version Mercedes–Benz vehicles into the United States and distributes them to authorized dealers. At no time during the class period did MBUSA (then known as Mercedes–Benz of North America)[1] engage in the business of providing retail financing or leasing of Mercedes–Benz vehicles sold by its authorized dealers. During the class period, numerous companies offered retail financing and leasing of new Mercedes–Benz vehicles, including MBCC. MBCC is a captive finance company which means it is the financial arm of the manufacturer. MBCC only does leasing transactions for Mercedes–Benz vehicles as opposed to leases for other makes of automobiles. Ninety-five percent of MBCC's finance transactions are for Mercedes–Benz vehicles. During the class period, approximately seventy percent of MBCC's business was leases and thirty percent financed transactions.

During the class period, MBUSA and MBCC were jointly owned by the same parent company, Daimler–Benz of North America Holding Company, Inc. MBCC was separate from and not owned by MBUSA. Furthermore, MBUSA did not hold or control any stock of MBCC and MBCC did not hold or control any stock of MBUSA. Two persons who are currently on the board of directors of MBUSA, Michael Bassermann and Ernst Stoeckl, were members on that board during part of the class period and have also sat or currently sit on the board of directors for MBCC.

Because MBUSA and MBCC are owned by the same parent company, they "have a vested interest in the company as a whole doing well." (MBCC Dep. at 51:18–52:1). MBUSA and MBCC interact in a number of ways. MBUSA shares sales information meaning actual sales numbers with MBCC. The purpose of sharing such information is because MBCC "need[s] to know how many sales they [MBUSA] have in order for us to determine whether or not we need to develop new programs which would possibly help them sell more vehicles." (*Id.* 48:22–49:2). MBUSA did not share such information with the other leasing companies whose representatives were deposed, Hann Financial Services Corp. ("hann"), and Chase Manhattan Automotive Finance Corp. ("chase"). Furthermore, unlike any other finance company, MBCC consults with MBUSA in developing joint programs to attract consumers to purchase Mercedes–Benz vehicles. Representatives from MBCC attend the regional MBUSA meetings where MBUSA and MBCC share marketing and sales information. No other finance companies attend those meetings. MBUSA also has national dealer meetings and MBCC is the only finance or leasing services organization invited to attend.

In addition to information about the relationship between MBUSA and MBCC, both parties submitted evidence about the mechanics of leasing transactions involving the defendant dealers during the class period. Any facts not supported by the referenced citations, however, are not recited here since unsupported assertions can not be used to defeat a motion for summary judgment. *Herbert v. Newton Memorial Hosp.*, 933 F.Supp. 1222, 1229 (D.N.J.1996) ("[A] party cannot rely upon self-serving

---

**1.** For the sake of clarity, the Court will refer to defendant MBUSA and its predecessors as MBUSA throughout this opinion.

conclusions, unsupported by specific facts in the record.").

To repeat, this motion deals solely with closed-end leases. Under the closed-end lease, the most common type of lease since the early 1990s, a lessee of a vehicle pays for the use of the vehicle for a certain term.[2] Unlike a purchaser, the lessee does not have to pay the purchase price of the car, either by cash on hand or by a down payment and financing. Instead, the lessor, which usually is a leasing company affiliated with a car manufacturer or a financial institution, pays the dealer the purchase price of the vehicle and thus owns or "buys" the vehicle. At the end of a closed-end lease, the lessee has an option to purchase from the leasing company the vehicle he or she leased. The principal attraction for customers to lease rather than purchase (or buy) is that monthly lease payments are generally lower than monthly payments for purchase transactions which are financed.

Monthly lease payments are comprised of two elements: the depreciation charge and the rent charge. The depreciation charge is calculated by subtracting the residual value of the vehicle from the adjusted capitalized cost and dividing that number by the number of months in the lease term. The residual value is the leasing company's estimate of the value of the car when the lease term ends. The leasing companies provide dealers with the residual values for all models of Mercedes–Benz vehicles and require that the dealers use these residual values to calculate depreciation. Leasing companies provide the same residual value for each vehicle model to all

dealers at any point in time and do not negotiate residual values with dealers or customers. In terms of estimating and adjusting residual values, the deposition of a representative from Chase shows that residual values are stated as a percentage of the manufacturer suggested retail price ("MSRP") of the vehicle as those numbers are published in the "Automotive Lease Guide." (Chase Dep. at 31:24–34:25). The deposition of a representative of MBCC shows that what percentage of the MSRP constitutes the residual value depends upon a number of factors that are considered in the following manner:

> The risk department looks at actual auction data, historical auction data. They translate that into a percentage, which they recommend to the marketing department as the value of the vehicle. The marketing department then looks at the marketplace, where the risk department's estimated residual value would place Mercedes–Benz Credit compared to our competition, meaning Chase and other banks that lease Mercedes–Benz vehicles. Based on that analysis, a residual is set.

(MBCC Dep. at 147:4–12).

The adjusted capitalized cost is the "agreed value" for the car, increased by any taxes, fees or use and service options to be paid for through the monthly payments and reduced by the value of any trade-in or any cash payment the lessee makes. The adjusted capitalized cost is the amount the leasing company pays to the dealer.

**2.** Plaintiffs submit evidence of other types of leases and loans including a balloon lease and a balloon loan. These transactions are relevant to one of plaintiffs' arguments. A balloon lease is really a financed purchase transaction in which a customer makes low monthly payments consisting primarily of interest and then makes a large payment at the

end of the lease. The vehicle in such a transaction is titled to the customer. The parties dispute whether the vehicle is titled in the customer's name before or after the large payment at the end. It is also disputed whether the customer is obligated to pay the balloon payment at the end of the lease or has the option of turning the vehicle back in.

The rent charge is the interest amount that the leasing company earns on the capital that it invests in the leased vehicle. The interest rate charged for use of capital is reflected in the money factor used to calculate the rent charge. The leasing companies provide the dealers with the money factors they are to use in calculating the rent charge. The leasing companies do not, however, necessarily provide all dealers with the same money factors. For example, leasing companies often make available lower money factors to dealers who originate large volumes of leases or commit to provide certain minimum volumes of leasing business. The monthly lease payment equals the sum of the monthly depreciation charge and the monthly rent charge.

Customers who are interested in leasing a new Mercedes–Benz vehicle usually negotiate the monthly lease payment as well as other lease terms such as duration and mileage allowance with the dealer. While the parties dispute the frequency with which dealers and customers negotiate the "agreed value" of the vehicle, it is undisputed that the customer negotiates the "agreed value" of the vehicle in at least a minority of lease transactions.

Leasing companies regularly adjust the residual values and money factors they provide to dealers to reflect changes in competitive conditions as time passes. In other words, residual values are not adjusted on a lease-by-lease basis. Dealers are very conscious that their profitability opportunities are expanded the more vehicles they are able to sell to customers or to leasing companies for lease to customers. Accordingly, they have a powerful incentive to reach an agreement with the customer.

Because dealers often do not have the exact vehicle the customer is interested in leasing, dealers are sometimes at a disadvantage when negotiating with a customer over a lease agreement. As the negotiations usually center around the monthly lease payment, dealers consider a number of ways to reduce the monthly lease payment. Besides adjusting the lease term, dealers will investigate which leasing company is able to offer the most favorable lease payments to the particular customer. Dealers will also negotiate with the leasing companies for a better money factor for a particular lessee. In terms of selecting a leasing company, the dealer usually chooses the leasing company unless the customer requests that the lease be assigned to a specific company.

In addition to negotiating with the leasing companies, dealers will reduce their own revenue to reduce monthly lease payments. Dealers have reduced the "agreed value" of the car; they have included options in the "agreed value" at no cost; and they have allowed more than the market value of a trade-in vehicle to reduce the adjusted capitalized cost. By reducing the agreed value or the adjusted capitalized cost, dealers reduce the amount leasing companies pay for the vehicles. Dealers have also made other concessions to gain lease agreements that did not directly affect the lease payment. Dealers have paid the remaining payments on expiring, but not yet expired, leases, and they have paid lease termination fees on existing leases. These types of adjustments in negotiations or some variation thereof took place every day at at least one of the defendant dealers, Mercedes–Benz of Princeton, during the class period.

After the dealer and the lessee negotiate the monthly lease payments, the lease is submitted to a leasing company for acceptance. At this point, the leasing company does a credit check of the customer and decides whether the lease is acceptable within the parameters it has set out for accepting leases. Some leasing companies

have dealer operating agreements in place with certain dealers that requires leasing companies to accept leases that fit all the representations and warranties as specified in the operating agreement. Once accepted, the dealer and the lessee sign the lease. The evidence shows that in some of the leases used during the class period, the dealer is indicated as the original lessor in the lease agreement. The lease agreements also provided, however, that the lease was assigned to a leasing company upon signing the lease. In the case of Mercedes–Benz of Princeton, in conjunction with lease execution, the dealer sold the vehicle to the leasing company, and provided it with title from the state motor vehicle administration showing the leasing company as the owner.

The leasing companies do not deal directly with the customers regarding the lease transaction. It is not until after the lease agreement has been executed and assigned do the leasing companies and lessees have contact. After the leasing company accepts the lease, the leasing company pays the dealer "the amount financed," which is the purchase price of the car, regardless whether the transaction is a lease or financed purchase.

Because residual values are adjusted and provided to dealers on a regular basis, such as quarterly, in the context of a single lease transaction, the "agreed value" of a vehicle does not affect what the residual value of the vehicle is for that transaction. That is not to say, however, that residual value estimates can not affect monthly lease payments. There is some evidence that leasing companies will adjust residual values and the money factors they provide to dealers to respond to competitive conditions in the industry. If a leasing company raises the residual value, it results in a lower depreciation charge. A lower depreciation charge translates into a lower monthly lease payment. However, when residual values are set higher, there is a risk that the actual value of the vehicle at the end of the lease term will be less than the estimated residual value, resulting in a loss to the leasing company. To deal with such losses, MBUSA and MBCC entered into residual value support agreements under which MBCC provided dealers with higher residual values than MBCC's residual risk and marketing departments deemed consistent with MBCC's business objectives. In return, MBUSA agreed to pay MBCC for any losses it suffered on disposition of the vehicles at the end of the lease terms that were attributable to the higher residual values. As example, if MBCC determined a particular vehicle to have a residual value of $30,000, MBUSA might agree to support a residual value of $31,000 to promote a lease of that vehicle. If the market value for the vehicle at the end of the lease is only $30,000, then MBUSA would owe MBCC $1,000. These residual value support agreements were in place for almost the entire class period. MBUSA did not enter into residual value support agreements with either leasing company Hann or Chase. Additionally, the lower the money factor, the lower the rent charge. There is evidence that competitive conditions in the leasing market affected whether leasing companies reduced their money factors. (Hann Dep. at 102:11–103:6).

There are some similarities between financing the purchase of a new Mercedes–Benz vehicle and leasing such a vehicle. Leasing companies themselves view leasing as part of the more general category of financing the acquisition of a vehicle. There are a number of similarities between leases and purchase loans: First, the customer is required to pay for and maintain certain levels of insurance on the vehicle. Second, the customer will bear any liability arising out of the use and operation of the vehicle. Third, the vehi-

cle is registered in the customer's name. Fourth, the customer bears the risk of loss if the vehicle is damaged or destroyed and is obligated to continue making payments until the lease agreement or the finance contract is paid in full. Fifth, the customer pays taxes on the vehicle. Sixth, if a customer fails to make payments, the finance/leasing company can repossess the vehicle.

There is no substantive difference regarding the negotiation of a price between a customer who wants to finance the purchase of a vehicle and a customer who wants to lease a vehicle. The only difference, if any, is that the leasing customer is more likely to focus on negotiating monthly payments rather than the overall selling price of the vehicle. In both finance-purchase and lease transactions, the negotiated monthly payment will depend on the ability of the customer to negotiate a good selling price, the creditworthiness of the customer and the interest rate and term for which the customer is able to qualify. The final selling price of a vehicle is not affected by whether someone is leasing the vehicle or financing the purchase of it. The final selling price in a financed purchase is the same amount referred to as the agreed value of the vehicle in a lease transaction. When a dealer and a customer do negotiate the agreed value of the vehicle, the leasing company is not involved in that negotiation.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See id.* at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir.2001). At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir.2002).

## DISCUSSION

Before addressing the substance of defendants' motions, the Court first notes that defendants Mercedes–Benz of Morristown, Midstate Motor Car Corp. d/b/a Millennium Automotive Group, Ray Catena Motor Car Corp., and Beifus Motors filed their motions for partial summary judgment, adopting the arguments of MBUSA, after the deadline for filing such motions

had passed. The March 8, 2004 Case Management Order states that "[a]ny motions regarding class membership, including *Illinois Brick*, shall be served on opposing parties no later than May 14, 2004 . . . ." While the Court will not let the defendants' tardiness deter it from considering the merits of defendants' arguments, the Court notes that such untimeliness is unacceptable and will not be treated so leniently in the future. The Court also takes notices of defendants' failure to submit a statement of undisputed material facts in accordance with Local Rule 56.1. While failure to submit such a statement is an appropriate ground to deny the motions, *see Comose v. New Jersey Transit Rail Operations, Inc.*, 2000 WL 33258658, *1 (D.N.J. Oct. 6, 2000), the Court is again willing to overlook this flaw with the understanding that the Court will not be as forgiving in the future if the parties do not comply with all applicable rules and orders.

## I. Allegations Concerning the Fixing of Lease Prices

■ Defendants first argue that the claims of the lessee plaintiffs should be dismissed because the Complaint does not allege that defendants fixed the monthly lease payments on new Mercedes–Benz vehicles. Defendants charge that the only price-fixing allegation in the Complaint— that defendants fixed prices for new Mercedes–Benz vehicles—cannot be read to include monthly lease payments. They further note that just because the purchase price of the vehicle plays a role in the calculation of monthly lease payments does not mean that the monthly lease payments were fixed.

Plaintiffs respond that the Court should reject this argument because this Court has already upheld the claims of lessee plaintiffs on a motion to dismiss the Complaint. Plaintiffs rely on the law of the case doctrine to support their contention

because this Court has already determined the adequacy of the allegations of the Complaint as they relate to the claims of the lessees. They argue that the law of the case doctrine applies to "both to issues expressly decided by a court in prior rulings and to issues decided by necessary implication." *Bolden v. Southeastern Pennsylvania Transp. Authority*, 21 F.3d 29, 31 (3d Cir.1994). Plaintiffs argue that this Court's denial of defendants' earlier motion to dismiss the Complaint establishes that this Court has already decided the sufficiency of plaintiffs' allegations with regard to lessees. They do not attempt to argue that the actual monthly lease payments were fixed. Rather, they contend that the evidence supports the lessees claims because the price-fixing impacted the lease payments.

Under the law of the case doctrine, "[t]he decision of an issue need not be express to establish the law of the case. Implicit decision suffices, and a terse decision is even more clearly the law of the case because it does not require a determination whether actual decision can be inferred." 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed.2002). In *Black v. Lane*, 22 F.3d 1395, 1398 n. 5 (7th Cir.1994), the Seventh Circuit applied the law of the case doctrine to bar reconsideration of the sufficiency of allegations of the complaint. In that case, an earlier appeal had resulted in reversal of summary judgment for the defendants. The majority of the Seventh Circuit panel hearing the case concluded that in reversing summary judgment the court necessarily had determined, although implicitly, that the complaint stated a claim. This ruling established the law of the case. *Id.*

■ Because the Court has already upheld the claims of all plaintiffs, including lessees, in its earlier decision on defen-

dants' motion to dismiss the Complaint; the Court will not now entertain defendants' argument that the allegations are insufficient to state a claim for lessee plaintiffs. In denying the motion to dismiss, the Court implicitly found that the Complaint stated a claim. The Court moves to the *Illinois Brick* issue, the crux of defendants' motion.

## II. The *Illinois Brick* Direct Purchaser Rule.

In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court enunciated what has become known as the direct purchaser rule. This rule imposes a limitation on which parties may have standing to bring suit for antitrust violations under section 4 of the Clayton Act. How this rule applies is the crux of this motion. Before *Illinois Brick,* the Supreme Court had held that "except in certain limited circumstances, a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it and that the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge." 431 U.S. 720, 724–25, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)). In other words, the *Hanover Shoe* court ruled that antitrust defendants could not assert as a defense against direct purchasers that such plaintiffs had "passed-on" any overcharge to indirect purchasers. The Supreme Court rejected the pass-on defense because of the complexity it would add to the litigation and the "concern that unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators 'would retain the fruits of their illegality' because indirect purchasers

'would have only a tiny stake in the lawsuit' and hence little incentive to sue." *Id.* at 725–26, 97 S.Ct. 2061 (quoting *Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. 2224). In *Illinois Brick,* the Supreme Court was confronted with whether indirect purchasers should be allowed to show antitrust injury by establishing that direct purchasers "passed-on" the overcharge to them. The alleged price-fixing was for concrete block; the plaintiffs were buyers of buildings constructed with concrete block. The block was purchased directly from the manufacturers by masonry contractors and used by them to build masonry structures; those structures were incorporated into entire buildings by general contractors and sold to plaintiffs. The *Illinois Brick* Court held that a pass-on theory may not be used offensively by an indirect purchaser against an antitrust defendant. The Supreme Court gave two reasons for its holding:

> First, allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants. Even though an indirect purchaser had already recovered for all or part of an overcharge passed on to it, the direct purchaser would still recover automatically the full amount of the overcharge that the indirect purchaser had shown to be passed on; similarly, following an automatic recovery of the full overcharge by the direct purchaser, the indirect purchaser could sue to recover the same amount. The risk of duplicative recoveries created by unequal application of the Hanover Shoe rule is much more substantial than in the more usual situation where the defendant is sued in two different lawsuits by plaintiffs asserting conflicting claims to the same fund. A one-sided application of Hanover Shoe substantially increases the possibility of inconsistent adjudications

and therefore of unwarranted multiple liability for the defendant by presuming that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the other plaintiff; overlapping recoveries are certain to result from the two lawsuits unless the indirect purchaser is unable to establish any pass-on whatsoever. As in *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972), we are unwilling to "open the door to duplicative recoveries" under § 4.

Second, the reasoning of Hanover Shoe cannot justify unequal treatment of plaintiffs and defendants with respect to the permissibility of pass-on arguments. The principal basis for the decision in Hanover Shoe was the Court's perception of the uncertainties and difficulties in analyzing price and out-put decisions "in the real economic world rather than an economist's hypothetical model," 392 U.S. at 493, 88 S.Ct. at 2231 and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in the courtroom. This perception that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants. However "long and complicated" the proceedings would be when defendants sought to prove pass-on, *ibid.*, they would be equally so when the same evidence was introduced by plaintiffs. Indeed, the evidentiary complexities and uncertainties involved in the defensive use of pass-on against a direct purchaser are multiplied

in the offensive use of pass-on by a plaintiff several steps removed from the defendant in the chain of distribution. The demonstration of how much of the overcharge was passed on by the first purchaser must be repeated at each point at which the price-fixed goods changed hands before they reached the plaintiff.

*Id.* at 730–33, 97 S.Ct. 2061 (footnotes omitted). The *Illinois Brick* Court further provided that:

Permitting the use of pass-on theories under § 4 essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

*Id.* at 737, 97 S.Ct. 2061. The Supreme Court reiterated the direct purchaser rule and its rationale in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).

Defendants have previously argued to this Court in their motion to dismiss the Complaint that *Illinois Brick* bars the claims of the lessee plaintiffs. At that time, the Court reserved judgment on this issue until the record was more fully developed. Since then, the parties have engaged in discovery directed to this issue and the Court finds that the record is now ripe to decide the issue.

Defendants have essentially renewed their earlier argument that the lessee plaintiffs do not have standing under *Illinois Brick* because they are indirect rather than direct purchasers. Defendants charge that the manner in which a lease

transaction is conducted demonstrates that the direct purchaser of new Mercedes–Benz vehicles is the leasing company, not the lessee. The leasing company pays the purchase price of the car to the dealer. Defendants contend that the facts show that part of any alleged overcharge was absorbed by either the leasing companies, because they adjusted residual values or money factors to remain competitive, or MBUSA in the sole circumstance of MBCC because of the losses supported by the residual value support agreements. (Greces Aff. at ¶ 19; Romaine Aff. at ¶ ¶ 12, 16; MBCC Dep. at 124–125, 137, 147; Hann Dep. at 103, 112–113). Because the evidence shows that the overcharge was not fully passed on to lessees, defendants argue, allowing the claims of lessees to go forward would add to the complexities associated with proving injury under a pass-on theory and this is exactly what the Supreme Court sought to avoid.

Defendants also argue that the *Hanover Shoe* Court's concern that "antitrust violators would retain the fruits of their illegality" if direct purchasers could not recover the full amount of the overcharge does not conflict with dismissing the lessees' claims because the individual customers and leasing companies who purchased new vehicles from defendants can be members of the class. 392 U.S. at 494, 88 S.Ct. 2224. Defendants concede that MBCC is not a member of the class meaning that at least one direct purchaser is not suing for the overcharge. But defendants point out correctly that the *Illinois Brick* Court considered this circumstance and nonetheless barred suits by indirect purchasers:

> We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers. But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of " 'private

attorneys general' " to enforce the antitrust laws under § 4 is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

*Id.* at 746, 97 S.Ct. 2061 (footnotes and citations omitted).

Plaintiffs challenge defendants' position by looking to other cases after *Illinois Brick* for guidance on the factors that are relevant to determining who is a direct purchaser. Plaintiffs argue that these cases demonstrate that the lessees are direct rather than indirect purchasers, and thus have standing to sue.

Plaintiffs first rely on *UtiliCorp* for the proposition that the critical element in defining a direct purchaser is whether plaintiffs are "the immediate buyers from the alleged antitrust violators." *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). The *UtiliCorp* Court commented that "[l]ike the State of Illinois in *Illinois Brick*, the consumers in this case have the status of indirect purchasers. In the distribution chain, they are not the immediate buyers from the alleged antitrust violators. They bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of the gas." *Id.* Applying this law to the facts here, given the nature of how lease transactions are negotiated and consummated, it seems like both the leasing companies and the lessees could be considered the immediate buyers here. The difference lies, however, in what the lessees and the leasing companies were buying; the leasing companies purchased the automobile while the lessees purchased the use of the automobile.

Plaintiffs also rely on the Seventh Circuit for its assertion that "*Hanover Shoe and Illinois Brick* allocate to the first non-

conspirator in the distribution chain the right to collect 100% of the damages." *Paper Systems Inc. v. Nippon Paper Industries Co., Ltd.,* 281 F.3d 629, 632 (7th Cir.2002). Again, it could be said here that both the leasing company and the lessees are the first non-conspirators in the chain. But to the extent that plaintiffs argue that lessees are the only first non-conspirators, this is problematic because there is no indication or allegation that the leasing companies were part of the price-fixing conspiracy.

In appearing before the Court, plaintiffs heavily emphasized two cases to support their position, *Loeb Industries, Inc., v. Sumitomo Corp.,* 306 F.3d 469 (7th Cir. 2002), and *Gulfstream III Associates, Inc., v, Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir.1993). In *Sumitomo,* the alleged antitrust violation was a conspiracy to fix the prices of copper futures on the international exchange markets. 306 F.3d at 474. Generally speaking, the plaintiffs were large companies which bought copper in various stages of its production process. *Id.* at 475. Plaintiffs alleged that defendants' price fixing in the futures market caused plaintiffs to pay artificially inflated prices for physical copper. *Id.* The *Sumitomo* court noted that because futures traders must either deliver or take physical copper when a futures contract matures depending on whether the trader is long or short, the price of physical copper is directly linked to the exchange prices for copper futures. *Id.* at 476. After the United States Commodities and Futures Trading Commission discovered the price fixing, class action lawsuits were filed on behalf of those who traded copper futures and on behalf of certain purchasers of physical copper. *Id.* at 477–78. By the time the case was appealed to the Seventh Circuit, the defendants had settled the suit with the futures traders. *Id.* at 478. In addressing whether plaintiff purchasers were barred from suing by *Illinois Brick,*

the *Sumitomo* court commented that "*Illinois Brick* does not stand for the proposition, as the defendants would seem to have it, that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase)." *Id.* at 481. The *Sumitomo* court relied on a later U.S. Supreme Court decision, *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), to support its conclusion that the defendants could be liable for injuries sustained in different markets as a result of a single antitrust conspiracy. *Id.* The *McCready* Court found that a plaintiff who subscribed to a group health plan paid for by her employer had standing to sue the insurer for an alleged conspiracy not to reimburse subscribers for certain health services. 457 U.S. at 474–75, 102 S.Ct. 2540. In addressing whether *Illinois Brick* barred the subscriber from suing, the *McCready* Court noted that the risk of duplicative recovery identified in *Illinois Brick* was not implicated:

> McCready has paid her psychologist's bills; her injury consists of Blue Shield's failure to pay her. Her psychologist can link no claim of injury to himself arising from his treatment of McCready; he has been fully paid for his service and has not been injured by Blue Shield's refusal to reimburse her for the cost of his services. And whatever the adverse effect of Blue Shield's actions on McCready's employer, who purchased the plan, it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits.

*Id.* at 475, 102 S.Ct. 2540. Upon consideration of *McCready,* the *Sumitomo* court found that the injuries suffered by the futures traders were distinct from any harm inflicted to the purchasers of physical copper. 306 F.3d at 481–82. In concluding that the plaintiffs were not indirect

purchasers along a supply chain, the court offered the following interpretation of the *Illinois Brick* rule:

> The reason the plaintiffs' suit in *Illinois Brick* failed was not because the defendants did not sell to them. Rather, it was because the defendants did sell to a third party who (after *Hanover Shoe*) could recover for any injury they claimed. The same paradigm applies in all of the cases cited by the defendants: Party A, the antitrust violator, sells to Party B, and then Party C, a downstream purchaser from B, seeks to recover the implicit overcharges that B passed on to C.

*Id.* at 482. The court then relied on another Seventh Circuit case, *Sanner v. Board of Trade*, 62 F.3d 918 (7th Cir.1995), to address the defendants' argument that the ability of the futures traders to recover should preclude recovery by the plaintiffs. There, the Seventh Circuit recognized that the futures market and the physical market must be evaluated separately, and found that damages sustained in the physical market as a result of market manipulation were not derivative of any injuries suffered in the futures market. *Id.* at 928–30. The court found that the damages inflicted in the physical market were a separate and compensable injury. *Id.*

Advancing *Sumitomo*, the present plaintiffs claim that the facts of this case do not fit within the paradigm *Illinois Brick* case, rendering the rule inapplicable to the lessees claims. Plaintiffs argue that the lessees did not lease their vehicles through middlemen as the paradigm envisions. Instead, they argue that it is the lessees who represent Party B in the paradigm instead of Party C. The mechanics of how a leasing transaction is initiated and executed provides support for plaintiffs' position because the lessees had direct interaction with defendants. This is unlike the paradigm in which there is usually no direct interaction between the antitrust violator and the indirect purchaser. The only logical conclusion here would be that there are two Party Bs in this scenario. Defendants sold the vehicle to the leasing companies and defendants sold the use of the vehicle to the lessees. This is closer to the two separable injuries recognized in *Sumitomo* then the paradigm's indirect purchaser scenario. Here there is evidence to demonstrate that the prices paid by leasing customers were inflated as a result of a conspiracy to fix the purchase prices of new Mercedes–Benz vehicles. In other words, the monthly lease payments paid by the lessees were higher than they would have been if the purchase prices had not been fixed. The Court is persuaded that, under the reasoning of *Sumitomo*, this is a separate injury from the one inflicted on those leasing companies who actually paid the inflated purchase price of the leased vehicles.

The Court's conclusion is enforced by another case heavily relied on by plaintiffs for the proposition that title is irrelevant to determining who is a direct purchaser is *Gulfstream III Associates, Inc., v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir.1993). The *Gulfstream III* plaintiff sued seven manufacturers of business jet aircraft alleging a horizontal price-fixing conspiracy to fix prices on new jets. *Id.* at 428. The claims that were the subject of the appeal involved two purchase agreements under which the plaintiff had agreed to purchase a Gulfstream Model IV aircraft and a Gulfstream Model III aircraft ("G–III"). *Id.* The plaintiff's practice was to enter into purchase agreements with manufacturers years before the planes would be ready for delivery. *Id.* at 429 n. 1. With respect to the G–III agreement, the plaintiff assigned the agreement before the plane was ready for delivery. *Id.* at 430. The only non-settling defendant had filed a motion for summary judgment on the ground that plaintiff lacked antitrust

standing, and the district court denied the motion. On appeal, the defendant argued that the plaintiff lacked standing to bring the G–III claim because it had assigned the agreement and thus never "purchased" the plane. In rejecting this argument, the Third Circuit offered the following commentary on antitrust standing:

[E]ven if this court accepted the view that standing should generally be limited to purchasers, defendant's argument seeks to exalt form over substance. Admittedly, plaintiff assigned its rights in the plane and purchase agreement and never took title to the G–III. Thus, plaintiff was not a purchaser in the ordinary sense of that word. Nevertheless, plaintiff executed a purchase agreement and remained contractually bound to pay the GIII's total purchase price up to and including the date of delivery. We believe in these circumstances that plaintiff's continuing contractual obligation nullifies this objection to its standing and, thus, summary judgment was properly denied.

*Id.* at 430.

The Court finds that case enlightening for its guidance on how courts should approach the determination of who is a purchaser. Like the *Gulfstream III* plaintiff, the lessee plaintiffs here are not purchasers in the ordinary sense because they did not take title to the vehicles they possessed. Although not bound to do so, a lessee has an option to buy the car at the end of the lease and thereby acquire ownership. But, under *Gulfstream III*, this does preclude them from being considered direct purchasers in the context of *Illinois Brick*. Except for the fact that the lessees did not pay the dealer defendants the purchase prices of the vehicles, the interaction between the lessees and the dealer defendants closely resembled that which occurs in a sales transaction. The lessees and the dealers negotiated the terms of the transaction, including the type of car to be

leased and the "agreed value" or purchase price of the vehicle in at least some of the transactions, the original lessors on the contracts were the dealers, the lessees made their first lease payments to the dealers, and the lessees had no interaction with the leasing companies until after the deal was consummated. These facts are indicative of a purchase-like transaction. The Court recognizes that the element present in *Gulfstream III*, that the plaintiff had executed a purchase agreement and remained contractually bound to pay the total purchase price up to and including the date of delivery, is not present here. The Court does not consider this fact to be determinative, however, as there are other material facts, such as those enumerated, that make the lessees akin to purchasers. The Court reads *Gulfstream III* to require that district courts look beyond a limited definition of direct purchaser to other facts that are suggestive of purchaser status, and the Court finds evidence of such facts here.

Plaintiffs also argue that the residual value risk born by the leasing companies is irrelevant to whether the lessees are direct purchasers. Plaintiffs charge that the leasing companies are only responsible for the residual value of the vehicle, meaning that the leasing companies only bear the risk that the vehicle will be worth less than the residual value at the end of the lease term. They contend that because residual values were not affected by the "agreed value" of the vehicle as that price was negotiated between the dealer and the lessee, the leasing companies could not have borne any of the illegal overcharge.

About residual value, both plaintiffs and defendants have presented persuasive arguments on this issue. As the Court sees it, there is evidence that both the lessees and the leasing companies were injured by defendants' alleged price fixing. There appears to be no dispute that the lessees

were injured because the prices they paid to lease new Mercedes–Benz vehicles were inflated by the price-fixing scheme.[3] While plaintiffs do appear to dispute that the leasing companies were injured by this practice, the Court finds evidence that they too were injured because they actually paid the purchase price of the leased vehicles and adjusted residual values on a regular basis throughout the class period to respond to competitive conditions. While neither plaintiffs nor defendants define "competitive conditions," it is useful to think about what constitutes a competitive condition to understand how the leasing companies were injured. Both from reason and practicality, it would appear that the key ingredient in the leasing industry is the monthly lease payment. As a matter of economics, the amount of a monthly lease payment drives consumer demand to lease a given vehicle. The lower the monthly lease payment, the more attractive it is to the potential lessee to lease a vehicle. So lower monthly lease payments would result in a higher number of leases for a given leasing company. The Court discussed earlier the factors that go into calculating a monthly lease payment and those factors include the purchase price and the residual value of the vehicle. If purchase prices are raised because of a price-fixing scheme, one way to keep monthly lease payments from rising is to raise the residual value so that the amount of the depreciation charge that is used to calculate monthly lease payments stays the same. Thus, to say that leasing companies adjusted residual values on a regular basis to respond to competitive conditions is evidence that the leasing companies may have raised residual values to combat higher purchase prices which were the result of a price-fixing scheme. While plaintiffs are correct in their assertion that the residual value in a given lease is not affected by the purchase price of a particular vehicle in that particular transaction, that is not to say that leasing companies did not respond thereafter so that the residual values would be higher in the next lease transaction. In other words, the way the Court sees it, while residual values would not have been adjusted higher for the first wave of lease transactions that took place after the price-fixing scheme began, there is evidence that the leasing companies thereafter adjusted residual values to keep monthly lease payments attractive to consumers and obtain more leases. From the evidence, it appears that both the lessees and the leasing companies suffered separate and distinct injuries which are compensable under the antitrust laws. Moreover, even if the leasing companies had not adjusted residual values and had not absorbed any of the alleged overcharge, under *Illinois Brick* and *Hanover Shoe*, the leasing companies may well have standing to sue as direct purchasers simply because they paid the purchase price of the new Mercedes–Benz vehicles to the dealer defendants. *Illinois Brick*, 431 U.S. at 724, 746, 97 S.Ct. 2061.

Because the Court finds that the lessee plaintiffs do have antitrust standing as direct purchasers, the Court need not consider if any of the exceptions to the *Illinois Brick* rule are applicable.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment is DENIED and Partial Summary Judgment is entered in favor of Plaintiffs.[4]

---

3. Defendants do not contend that the prices paid by lessees were inflated. Rather, they argue that at least some of the overcharge was borne by the leasing companies or MBU-SA. (Defs.' Br. at 27).

4. While plaintiffs did not formally cross-move for summary judgment, they appear to argue that the lessees are direct purchasers as a matter of law. *See Old Bridge Owners Co-op. v. Township of Old Bridge*, 981 F.Supp. 884,

## ORDER

It is on this 12th day of April, 2005,

ORDERED that Defendants' Motion for Partial Summary Judgment is DENIED and Partial Summary Judgment is entered in favor of Plaintiffs.

887–88 (D.N.J.1997) (granting summary judg-     ment for non-moving party).