# United States Court of Appeals

## For the First Circuit

No. 07-1990

IN RE: NEW MOTOR VEHICLES
CANADIAN EXPORT ANTITRUST LITIGATION,

BARRY COHEN; SARAH EPSTEIN; PHINEAS A. ADLER,

Plaintiffs,

SURI SKORSKI; ELI ELBAZ; SEAN GREGOR AND ASSOC., CO., L.P.A.,

Plaintiffs, Appellants,

v.

GENERAL MOTORS CORPORATION; FORD MOTOR COMPANY; AMERICAN HONDA
MOTOR COMPANY INC.; DAIMLERCHRYSLER CORPORATION; DAIMLERCHRYSLER
MOTORS CO., LLC; MERCEDES-BENZ USA, LLC; GMAC LLC;
DAIMLERCHRYSLER FINANCIAL SERVICES AMERICAS LLC,

Defendants, Appellees,

NATIONAL AUTOMOBILE DEALERS ASSOCIATION; BASS FINEBURG LEASING
INC.; GENERAL MOTORS ACCEPTANCE CORP.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Chief Judge,
Cudahy,* Senior Circuit Judge,
and Torruella, Circuit Judge.

---

* Of the Seventh Circuit, sitting by designation.

Mark Schlachet for appellants.

William J. Kayatta, Jr., with whom Clifford H. Ruprecht, Pierce Atwood LLP, James C. Egan, Jr., Kirsten A. Lockhart, Carrie M. Anderson, and Weil Gotshal & Manges were on brief for appellees Chrysler LLC, Chrysler Motors LLC, DaimlerChrysler Financial Services Americas LLC, and Mercedes-Benz USA, LLC.

John H. Rich III, Perkins & Thompson, P.A., Robert A. Van Nest, Ragesh K. Tangri, Rachael E. Meny, Daniel Purcell, and Keker & Van Nest, LLP were on brief for appellee American Honda Motor Co., Inc.

Margaret M. Zwisler, William R. Sherman, and Latham & Watkins LLP were on brief for appellee Ford Motor Company.

Richard C. Godfrey, David J. Zott, Daniel E. Laytin, and Kirkland & Ellis LLP were on brief for appellees General Motors Corp. and GMAC LLC.

———————————

June 30, 2008

———————————

**LYNCH**, **Chief Judge**.  Plaintiffs, lessees of new cars produced by defendant manufacturers, appeal the dismissal of their putative class action lawsuit in which they seek antitrust damages under section 1 of the Sherman Act, 15 U.S.C. § 1, and section 4 of the Clayton Act, 15 U.S.C. § 15.  See In re New Motor Vehicles Canadian Exp. Antitrust Litig. (Motor Vehicles II), 490 F. Supp. 2d 13 (D. Me. 2007).  Plaintiffs allege that defendant manufacturers conspired to restrict the flow of cheaper Canadian cars into the U.S. market (when the U.S. dollar enjoyed a favorable exchange rate), resulting in artificially high rental payments under plaintiffs' lease agreements in the United States.  Because plaintiffs are indirect purchasers, they lack standing to sue under section 4 of the Clayton Act and their suit was correctly dismissed under the rule of Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), and Kansas v. UtiliCorp United, Inc., 497 U.S. 199 (1990).

I.

This case arises out of the same multi-district litigation ("MDL") as another case recently before this court.  See In re New Motor Vehicles Canadian Exp. Antitrust Litig. (Motor Vehicles III), 522 F.3d 6 (1st Cir. 2008), from which the background facts can be gleaned.  See id. at 9-11.

Briefly, appellants assert that Canadian and U.S. car manufacturers conspired to prevent cheaper Canadian cars from entering the U.S. market during a time when the U.S. dollar was

-3-

much stronger than the Canadian dollar (roughly 2001 to 2003). This allegedly allowed the manufacturers and their captive leasing companies, two of which are also named as defendants, to maintain artificially high prices for new cars in the United States.

The district court held in an earlier decision that a putative MDL plaintiff class containing both purchasers and lessees of new cars could not seek antitrust damages under federal law because they were indirect purchasers under the rule of Illinois Brick. In re New Motor Vehicles Canadian Exp. Antitrust Litig. (Motor Vehicles I), 307 F. Supp. 2d 136, 137 (D. Me. 2004). At that time, the district court noted that future plaintiffs could potentially avoid the Illinois Brick bar by "join[ing] as named defendants the dealers from whom they purchased or leased and prov[ing] that those dealers joined in the conspiracy." Id. In the cases now before us (which were more recently transferred from Ohio to the district court), plaintiffs are all lessees, not purchasers. They rely on that distinction in an attempt to circumvent the Illinois Brick hurdle. The district court found this effort unavailing and dismissed their claim, holding that they were also indirect purchasers. Motor Vehicles II, 490 F. Supp. 2d at 17.

Our review of dismissals under Rule 12(b)(6) is de novo. Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 18 (1st Cir. 2008). We describe the Supreme Court law on indirect purchasers

-4-

before turning to the mechanics of automobile leasing arrangements and their implications for plaintiffs' standing to sue under the Clayton Act. The plaintiffs rely heavily on an inapposite district court opinion and also attempt to recharacterize what they pled in their complaint. Both efforts fail.

## II.

In <u>Hanover Shoe, Inc.</u> v. <u>United Shoe Machinery Corp.</u>, 392 U.S. 481 (1968), a manufacturer sued United Shoe, the lessor of its manufacturing equipment, under section 4 of the Clayton Act. United Shoe, in turn, asserted a "passing-on" defense, arguing that Hanover Shoe would have passed some of the alleged overcharge on to its customers and thus should not be allowed to recover the full amount of the antitrust injury. <u>Id.</u> at 487-88. The Court rejected that argument because of the impracticality of apportioning the damages between direct purchasers (like Hanover Shoe) and any subsequent, "indirect" purchasers (like Hanover Shoe's customers). <u>Id.</u> at 492-93. The Court also articulated a concern that allowing apportionment would dilute the incentive for any one plaintiff to bring suit, weakening the effectiveness of private antitrust enforcement under section 4. <u>Id.</u> at 494.

The Court reaffirmed this rule in <u>Illinois Brick</u> and expanded it to cover plaintiffs as well: if defendants could not rely on passing-on defenses, purchasers could not seek to recover when their injury depended upon passing-on theories. <u>Ill. Brick</u>,

431 U.S. at 735, 737. In other words, indirect purchasers cannot recover damages under section 4 of the Clayton Act. This bright-line rule was necessary, the Court reasoned, to prevent multiple recoveries (by both direct and indirect purchasers) and to avoid the complexity and difficulty of apportioning damages. Id. at 730-32, 737. While recognizing that "these difficulties and uncertainties will be less substantial in some contexts than in others," the Court refused to create exceptions to the rule for particular types of markets. Id. at 743-44.

UtiliCorp put teeth into the Court's refusal to carve out exceptions to the Illinois Brick rule. Confronted by a situation where plaintiffs alleged that the direct purchaser would pass all of the illegal overcharge on to its consumers, the Court still refused to allow the indirect purchasers to seek antitrust damages. UtiliCorp, 497 U.S. at 208. The Court determined that assuming a complete passing-on by the direct purchaser was inappropriate because a direct purchaser could potentially have raised prices irrespective of the overcharge. Id. at 209-10. The Court also pointed out other ways in which the direct purchaser could be hurt by the antitrust activity, such as by a delay in implementing the price increases. See id. at 210. Further, the UtiliCorp litigation itself demonstrated that determining when an Illinois Brick exception is truly justified would generate the type of complicated and costly litigation that the Illinois Brick rule was

-6-

meant to avoid. Id. at 216-17. For this reason, the Court concluded, "even assuming that any economic assumptions underlying the Illinois Brick rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." Id. at 217.

### III.

Given this bright-line rule, plaintiffs' case depends on establishing that they are direct rather than indirect purchasers. Plaintiffs assert vigorously that their case is almost identical to that of In re Mercedes-Benz Antitrust Litigation, 364 F. Supp. 2d 468 (D.N.J. 2005), in which the district court declined to dismiss a class action brought by lessees against a car manufacturer and its dealers because the court determined that the lessees were direct purchasers under Illinois Brick. Whether or not we would reach the same conclusion as was reached in that case, it is easily distinguishable. To understand why, one must understand the mechanics of automobile leasing arrangements.

Generally in leasing arrangements, dealers buy the car from the manufacturer, negotiate the purchase price and contract terms directly with the lessee, and execute the lease. Id. at 472-73. A leasing company then pays the full purchase price of the car to the dealer in exchange for the lease, and thereafter the lessee makes monthly payments to the leasing company. Id. at 473.

The lessee does not deal directly with the leasing company until after the lease is executed and the leasing company has paid the purchase price to the dealer. Id. at 473, 481. While leasing companies do set certain parameters for lease arrangements depending on the brand and model of car, dealers maneuver around the effects of those set rates by negotiating lower purchase prices, adding options at no additional cost, or agreeing to allow more than market value for a trade-in vehicle. Id. at 471-72. There is thus "no substantive difference" between a negotiation for the direct purchase of a car and the negotiation of a lease. Id. at 474.

In Mercedes-Benz, plaintiff-lessees alleged that a car manufacturer (Mercedes-Benz) directly conspired with its dealers in the greater New York City area to set the price of cars sold to customers. Id. at 469. The defendants in that case included both the manufacturer and individual dealers. Because plaintiffs alleged a vertical conspiracy involving both the dealers and the manufacturers, the court concluded that the dealers' customers were direct purchasers and had standing to sue for antitrust injuries under the Clayton Act. Id. at 482.

The court's concern in that case was the risk of double recovery. Because leasing companies were paying the full (inflated) purchase price of the cars to the defendant dealers, they, too, could be considered direct purchasers. Id. at 478. The

Mercedes-Benz court concluded, however, that the lessees and the leasing companies suffered distinct injuries -- higher monthly payments for the use of the cars for lessees versus higher purchase prices for the ownership of the cars for the leasing companies -- so that even if both sets of direct purchasers were to sue, they would recover different damages. Id. at 480, 482; see also id. at 479 (discussing Blue Shield of Va. v. McCready, 457 U.S. 465, 475 (1982)).

There is a significant difference between Mercedes-Benz and this case: plaintiffs here did not join dealers as defendants, nor did they plead sufficiently or argue consistently that dealers were part of the conspiracy. Instead, plaintiffs' complaints describe a horizontal conspiracy among the manufacturers that adversely affected dealers as well as the ultimate consumers. Plaintiffs alleged in their complaints -- and repeat in their appellate brief -- that because of the manufacturers' conspiracy, dealers paid higher prices for their inventory. Because dealers negotiate price and lease terms directly with lessees, any higher prices paid by dealers to manufacturers would have trickled down into the lease terms for plaintiff lessees; the leasing companies, co-conspirators or not, had limited influence on the amount of the lessees' monthly payments.[1] The dealers in the case before us were

---

[1] Thus joining a few leasing companies, even if those lessors were alleged to be part of the conspiracy, does not solve the problem.

-9-

the direct purchasers; they were "the immediate buyers from the alleged antitrust violators," not the lessees. UtiliCorp, 497 U.S. at 207.

Before this court, plaintiffs' arguments take on qualities reminiscent of Lewis Carroll's Through the Looking Glass. Plaintiffs try to re-frame their allegations as one of "vertical conspiracy," claiming that "[t]he dealers did not pay an overcharge to manufacturers and pass it on to the consumers" and that "[c]onsumers do not claim that they suffered damage because the dealers passed-on any anti-competitive pricing or other overcharges from the wholesale to the retail level." This approach contradicts their fact-pleading.

In their complaints, plaintiffs do refer at times to dealers as members of the conspiracy, but these references were primarily to Canadian dealers, not to the U.S. dealers who actually negotiated the leases. More importantly, those passing and general allusions are contradicted and outweighed by plaintiffs' clear allegations in the complaints that dealers also paid higher prices due to the conspiracy. Examples from their complaints include that the defendant manufacturers "charged their dealers in the United States 10-30% more for their motor vehicles than they charge[d] their Canadian dealers," and, in the very first paragraph of both complaints, that "dealers were charged noncompetitive prices by the Automobile Companies and passed that extra charge to [plaintiffs]."

Plaintiffs try to distance themselves from their own complaints by explaining that they copied the "passing-on" language from the briefs of other MDL plaintiffs, but that explanation carries no legal significance. What matters here is what plaintiffs pled in their complaints, and the facts alleged in those complaints contradict the existence of a vertical conspiracy. See, e.g., Global NAPs, Inc. v. Fed. Ins. Co., 336 F.3d 59, 66 (1st Cir. 2003) ("[W]e cannot credit a theory of [recovery] that flatly contradicts facts and assertions made explicit in the complaint."); Carroll v. Xerox Corp., 294 F.3d 231, 242 (1st Cir. 2002) (similar).[2]

Further, even were we to consider this argument, failure to join the dealers in this case would risk duplicative recovery. Any finding of a vertical conspiracy between manufacturers and dealers in this case would not preclude the dealers from initiating their own suit claiming that they were victims of the manufacturers' conspiracy and seeking recovery as direct purchasers under Illinois Brick. See P. Areeda et al., IIA Antitrust Law ¶ 346h, at 175-76 (3d ed. 2007); see also Motor Vehicles I, 307 F. Supp. 2d at 141 & n.5.

---

[2] Plaintiffs claim that the district court accepted by implication their motion to amend their complaint, made without any further elaboration in a footnote in their response to defendants' motion to dismiss. This argument is without merit.

-11-

In connection with their attempted recasting of their claim as one of vertical conspiracy, plaintiffs compare their case to other cases involving resale price maintenance theories, but to no avail.  Plaintiffs simply did not plead in their complaints that manufacturers and dealers conspired to set the prices used in the lease agreements between dealers and lessees.  See Bell Atl. Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007) (stating a claim under section 1 of the Sherman Act, as plaintiffs attempt to do here, "requires a complaint with enough factual matters (taken as true) to suggest that an agreement was made"); cf. Leegin Creative Leather Prods., Inc. v. PSKS, Inc., ___ U.S. ___, 127 S. Ct. 2705, 2725 (2007) (refusing in a resale price maintenance case to consider a horizontal conspiracy theory not alleged before the lower courts).[3]

In trying a different tack, plaintiffs put too much weight on the distinction drawn in Mercedes-Benz between use and purchase.  First, Mercedes-Benz is not binding authority on this court, and we do not necessarily adopt that distinction.  Second, that distinction simply does not matter here.  Both lessees and lessors are indirect purchasers in this scenario.  Whatever the distinction between purchase and use, the cost of both is increased

---

[3]    Plaintiffs appear to confuse what they plead in their complaints with what they argue in their briefs before this court and the court below.  As already noted, it is the fact-pleading in the complaints that controls.

when the dealer's invoice price is increased, and the overcharge allegedly suffered by lessees is at least in part due to these higher costs imposed on the dealers.[4]

In a final effort to salvage their complaints, plaintiffs argue that there is no risk of double recovery here because the statute of limitations has run, barring the dealers from filing their own suit against the manufacturers. There are many problematic aspects to this assertion, but it suffices here simply to point out that plaintiffs failed to raise this argument before the district court and thus have waived it.[5] Teamsters Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("[L]egal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

In sum, these complaints on their face do not allege a scenario in which plaintiffs could be direct purchasers. See

_____

[4] Similarly, Mercedes-Benz does not suggest that there is anything inherent about leasing arrangements that makes lessees' alleged injuries distinct from the injuries of the dealers. For example, plaintiffs are adamant that the dealers could not recover duplicative damages because the dealers do not pay the overcharges in the monthly lease payments, or because the dealers never paid for the "use" of the cars. That, however, is equivalent to arguing that a dealer who does not pay a purchaser's monthly car payments has no claim for antitrust damages against the manufacturer that overcharged the dealer for the car in the first place. These are both indirect purchaser situations.

[5] Plaintiffs did note before the district court that the statute of limitations might have run on the dealers, but they did not argue that its expiration had any legal significance, as they attempt to do here.

Morales-Tañon, 524 F.3d at 18 (to survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "more than labels and conclusions," and its factual allegations must be sufficient to "raise a right to relief above the speculative level" (quoting Bell Atl., 127 S. Ct. at 1965) (internal quotation marks omitted)).

## IV.

Under the facts alleged, plaintiffs are indirect purchasers under the rule of Illinois Brick. They have thus not stated a claim for which relief can be granted. The order of dismissal is affirmed.